**STATE of Missouri, Respondent,**

v.

**Maria ISA, Appellant.**

**No. 74479.**

Supreme Court of Missouri, En Banc.

March 23, 1993.

Charles M. Shaw, Clayton, for appellant.

William L. Webster, Atty. Gen., John M. Morris, Asst. Atty. Gen., Jefferson City, for respondent.

ROBERTSON, Chief Justice.

The State indicted Maria Isa ("Isa"), charging her with one count of first degree murder. Section 565.020, RSMo 1986. A jury convicted Isa of first degree murder and recommended the death penalty. The trial court sentenced Isa to death. She now appeals her conviction and sentence. This Court has exclusive appellate jurisdiction where the death penalty is imposed. Mo. Const. art. V, § 3. We affirm Isa's first degree murder conviction and reverse her sentence of death. The case is remanded to the trial court for a new penalty-phase hearing and for sentencing.

## I.

We view the facts in the light most favorable to the verdict. *State v. Guinan*, 665 S.W.2d 325, 327 (Mo. banc), *cert. denied*, 469 U.S. 873, 105 S.Ct. 227, 83 L.Ed.2d 156 (1984).

Palestina Isa ("Tina") was born on December 3, 1972, the youngest daughter born to Zein and Maria Isa. Her three older sisters, Azizah, Fatima, and Soraia, had married and moved from their parents' home. Sixteen-year-old Tina lived with her parents at 3759 Delor in the City of St. Louis.

The Isa family joined diverse cultural and religious backgrounds. Zein Isa is a Palestinian and of the Islamic faith. Appellant is Brazilian and of the Catholic faith. Out of this unique home, Tina acquired the ability to speak fluently four different languages, Arabic, Portuguese, Spanish and English. Rigid cultural traditions, however, soon became a point of tension between Tina and her parents.

In 1989, Tina was a senior at Roosevelt High School. She had excelled as a student and played on the school's soccer and tennis teams. As Tina's school activities expanded and her social life flourished, her parents became concerned that she would escape their control. They began to monitor and limit her activities; they forbad Tina from attending her Junior American Studies class field trip to Washington, D.C., her junior prom, and a free college preparatory program at the University of Missouri–Columbia.

Much of the conflict between Tina and her parents centered around Tina's relationship with Cliff Walker, a young black man. Both Zein Isa and appellant strenuously objected to Tina's relationship with Mr. Walker because of his color. In spite of her parents' objections, however, Tina continued to see Mr. Walker. As a result, the disagreements between Tina and her parents escalated.

On October 13, 1989, appellant visited Roosevelt High School with the intention of withdrawing Tina from school. In a conversation with Tina's guidance counselor, Pamela Fournier, appellant explained that Tina was being withdrawn for "not obeying family rules" and to prevent Tina's further association with Mr. Walker. Ms. Fournier discussed with appellant the value of an education and Tina's potential for a college scholarship. Appellant agreed to delay Tina's withdrawal until after a meeting of appellant, Tina and Ms. Fournier, scheduled for the following Monday.

During the Monday conference, appellant remained hostile and belligerent. Appellant told Ms. Fournier that neither she nor her husband wanted Tina "going out with a black boy." Appellant further described Tina as a "tramp" and a "whore" who had gone against her family. Following the meeting, Isa did not withdraw Tina from school, as she had intended.

Near the end of October, 1989, Tina, unbeknownst to her parents, found employment at Wendy's Restaurant on the corner of Gravois and Grand. She told her parents of her employment by taping a note to the television on November 5, 1989, her first day of work. The note informed her parents that she would return at 11:30 p.m.

At some point prior to November 5, 1989, Zein Isa came under suspicion for espionage activities against the United States. With federal court approval, FBI agents placed surveillance microphones in the Isa home and began taping conversations there. The Isa's phone lines were also tapped. Much of the factual information that follows is the product of that surveillance.

When Tina returned home at 11:59 the evening of November 5, 1989, appellant asked her "[w]here have you been, bitch?" Tina explained that she had been working at Wendy's. Both Zein Isa and appellant found Tina's answer unsatisfactory and an argument erupted.

Zein Isa confronted Tina regarding her relationship with Mr. Walker. Zein told his daughter that her behavior was shameful and purely "fornication." Appellant attacked Tina on her motivation for working. Appellant charged, "This life of yours is unacceptable! Do you understand? This life is unacceptable!"

Zein Isa: Listen to what I say to you. Until you reach 17, I am prepared to provide for you. Why? You don't do anything but eat, drink, and sleep. I swear! [unclear] the money is not enough, and you have stolen from me. Why do you play this game now?

Maria Isa: Do you want to sleep here?

Tina: [unclear]

Maria Isa: If you want to sleep here then you don't need any money.

Tina: Come on! Throw me out!

Maria Isa: Do you want to drink water from here?

Zein Isa: What about it? What do you want, Tina?

Tina: I say, nothing.

Zein Isa: So you are going to leave us. To go where?

Tina: Does it matter?

Maria Isa: Where is the key?

Tina: Of your house?

Maria Isa: Yes, of my house!

Tina: Are you throwing me out?

Maria Isa: Give me the key to my house.

Tina: Then, you don't want me to live here?

Maria Isa: Of my house here!

Tina: Okay, here is the key. [unclear] Not this! This is the newspaper from the school. You're not going to touch it!

Maria Isa: I just want to see it!

Tina: Here it is! [unclear] Roosevelt Roughriders.

Zein Isa: Here listen, my dear daughter, do you know that this is the last day. Tonight, you're going to die?

Tina: Huh?

Zein Isa: Do you know that you are going to die tonight?

Maria Isa: What do you have in this bag here? Whose shoes are these?

Tina: Why?

Maria Isa: I want to see what is in it. Are you going to forbid me from seeing what is inside? Whose shoes are these?

Tina: Mine.

Zein Isa: See you are touching her things. Just put it out the door.

Maria Isa: Where do you intend get with this, Tina?

Tina: I don't want to get anywhere!

Maria Isa: Why? You're not going to get anywhere.

Zein Isa: You want to wait until you're seventeen and then leave. Isn't it so?

Maria Isa: Tina, if you want to continue working, you don't sleep here!

Tina: In that case, I'll leave right now!

Maria Isa: You left earlier, and now you don't even have to sit here!

Tina: [unclear]

Maria Isa: If you don't want to talk with me, then you don't belong to the family! Let me see! What do you have here?

Tina: My books, Mom! They're not yours! They belong to the school!

(Conversation is interrupted by Tina's continuous screaming)

Zein Isa: Keep still, Tina!

Tina: Mother, please help me!

Maria Isa: Huh!. What do you mean!

Tina: Help! Help!

Maria Isa: What help?!

Tina: (screams)

Maria Isa: Are you going to listen? Are you going to listen?

Tina: (screaming louder) Yes! Yes! Yes, I am. (starts coughing) No. Please!!

Maria Isa: Shut up!

Tina: No! No!

Zein Isa: [unclear]

Tina: (crying)

Zein Isa: Die! Die quickly! Die quickly!

Tina: (Moans; her voice lowers)

Zein Isa: Clean her! Clean her bottom!

Tina: (Screams louder)

Zein Isa: Quiet, little one! Die my daughter, die!

An autopsy performed on Tina revealed six puncture wounds on her left breast and several small prick wounds on her chest and neck. The tight cluster of these wounds indicated that Tina was not moving when stabbed. In her statement to police immediately following the murder, a blood-stained Maria Isa acknowledged having grabbed her daughter from behind during the struggle. Tina also suffered a two-inch bruise on top of her head and deep scratches on her neck.

Hairs found in Tina's hand were consistent with hair found on the arms of the appellant. Numerous cuts on Tina's hands were consistent with injuries sustained in an effort to fend off a knife attack. Tina died from a knife wound through her breastbone and into her heart and a second fatal stab wound that entered her left lung. To inflict these wounds required great force.

The murderous act completed, appellant called for police and ambulance assistance. During this call the following conversation took place:

Maria Isa: Take your shirt off!

Zein Isa: Huh?

Maria Isa: Take this shirt off!

Zein Isa: Why? No! She was the one who wanted to kill her father! I got a knife and she took it away from me, you see! Kill her father?!

In the following minutes, Zein Isa and appellant made calls to several relatives telling each that Tina had attacked them with a knife and had been killed in the exchange. When the police arrived at the apartment, Tina's body lay prone on the living room floor with two knives lying near her head. Neither Zein nor appellant were visibly shaken or upset by the event. Both Zein and appellant made statements to the police recounting a story of how their daughter attacked them in an attempt to obtain five thousand dollars.

The jury found Isa guilty of first degree murder for the killing of her daughter, Tina, and recommended that Isa be put to death for her part in the murder. The trial court sentenced Isa to death.

## II.

Isa raises 35 points of error. We consider the points raised in relation to the chronological order of trial.

### A. Assignment of Judge

Isa's trial was originally assigned to Judge William Geary in Division 10, of the Circuit Court for the City of St. Louis. The State moved for a change of judge. Rule 32.07. Judge Charles A. Shaw, Division 21, received the reassignment. Isa alleges error with this reassignment. She claims that (1) the record does not show that she received a copy of the State's motion and (2) the assigning judge was without authority to assign this matter to Judge Shaw.

■ Isa raised this argument for the first time on appeal. We review it only for plain error. Rule 30.20; *State v. Hunter*, 840 S.W.2d 850, 859 (Mo. banc 1992).

Rule 32.07 provides the procedural mechanism for a change of judge in a misdemeanor or felony action. Rule 32.07(e)(4) provides that a case may be reassigned "in accordance with local rules." Local Rule 67.10.1.7 of the Circuit Court of the City of St. Louis governs the assignment of cases following a valid motion for change of judge under 32.07. Nothing in the record indicates that the circuit court deviated from the procedure set forth in Local Rule 67.10.1.7.

■ Plain error relief is appropriate only when the alleged error so substantially affects the rights of the defendant that a manifest injustice or miscarriage of justice results. Rule 29.12(b). The defendant bears the burden of showing that an alleged error has produced such a manifest injustice. *State v. Parkus*, 753 S.W.2d 881, 888 (Mo. banc), *cert. denied*, 488 U.S. 900, 109 S.Ct. 248, 102 L.Ed.2d 237 (1988). Mere allegations of error and prejudice will not suffice. *See State v. Kilgore*, 771 S.W.2d 57, 67 (Mo. banc), *cert. denied*, 493 U.S. 874, 110 S.Ct. 211, 107 L.Ed.2d 164 (1989).

■ Reassignment of this case occurred nearly ten months prior to trial. Isa had substantial time to offer any objections she had to Judge Shaw; she failed to do so. Bare allegations of inconsequential and unchallenged procedural irregularities do not rise to manifest injustice or plain error. The point is denied.

### B. Pre–Trial Motions

Prior to trial, Isa filed several procedural motions and a motion challenging the admission of evidence. Of the six motions overruled by the court, Isa alleges error with regard to four. We address each claim of error independently.

#### 1.

First, Isa contends that the trial court erred in overruling her motion to sever her trial from the trial of her husband, Zein.

Originally, the State indicted appellant and Zein Isa separately. The State, however, filed and the trial court sustained a motion to join the defendants for trial. Isa moved for severance. The trial court overruled the motion. Isa submits two grounds to support her claim: (a) the trial court's refusal to sever is contrary to the joint trial standard enunciated in *Bruton v. United States*, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968); and (b) permitting a joint trial violated Rule 24.06 and Section 545.880.2, RSMo 1986.

#### a.

■ *Bruton* holds that a defendant is deprived of his rights under the Confrontation Clause of the Sixth Amendment when his codefendant's confession directly implicates him as a participant in the crime, is introduced at their joint trial, and the codefendant does not testify. An instruction to the jury to consider the confession only against the codefendant does not remedy the constitutional violation.

■ This case is factually different from *Bruton*. First, Zein Isa's out-of-court statement to police indicated that appellant had *no* part in Tina's stabbing. In fact, Zein confessed to sole responsibility for the fatal stabbing. Zein Isa's statement did not implicate Isa. It assisted her defense in that the confession exculpated her from involvement in the crime. Second, unlike *Bruton*, Zein Isa testified and was subject to cross-examination by appellant's counsel. She received her full rights under the Confrontation Clause.

For both of these reasons, Isa's reliance on *Bruton* is misplaced. The point is denied.

#### b.

Isa next argues that permitting the joint trial violated Rule 24.06 and Section 545.880.2, RSMo 1986. Rule 24.06 requires that defendants be tried separately only if a defendant files a written motion for severance and the court finds the probability of prejudice exists; or:

(1) The defendant is subject to assessment of punishment by the jury and the defendant shows a probability of prejudice would result from this fact if he is not tried separately; or

(2) There is, or may reasonably be expected to be material and substantial evidence not admissible against the defendant that would be admissible against other defendants if a separate trial is not ordered; or

(3) There is an out-of-court statement that is not admissible against the defendant that would be admissible against other defendants if a separate trial is ordered unless the court finds the out-of-court statement can be limited by eliminating any reference to the defendant; or

(4) A separate trial is necessary to a fair determination of whether the defendant is guilty.

Likewise, Section 545.880.2 requires the trial court to consider the "probability for prejudice" to appellant in a joint trial. Section 545.880.2(4) provides that the trial court "shall find" that the "probability for prejudice" exists if severance of the joint defendants is necessary to achieve a fair determination of guilt or innocence of any defendant.

■ Courts traditionally favor joint trials. Joint trials "play a vital role in the criminal justice system," *Richardson v. Marsh,* 481 U.S. 200, 209, 107 S.Ct. 1702, 1708, 95 L.Ed.2d 176 (1987), and "serve the interests of justice by avoiding inconsistent verdicts and enabling more accurate assessment of relative culpability—advantages which sometimes operate to the defendant's benefit." *Id.* at 210, 107 S.Ct. at 1709. A motion to sever is appropriate only where there exists a serious risk of compromise of the defendant's rights or the jury's ability to make a reliable judgment about guilt or innocence.

Isa posits that a series of recorded conversations between Zein Isa, his daughters, and his sons-in-law incriminated Zein and thus were admissible solely against him. Appellant further maintains that the admission of these statements during the joint trial created an impermissibly prejudicial inference of Isa's own guilt. The prejudicial effect of this evidence, contends appellant, mandated severance of the joint trial under Rule 24.06 and Section 545.880.2.

■ The decision to sever a joint trial lies within the sound discretion of the trial court. *State v. Mahurin,* 799 S.W.2d 840, 843 (Mo. banc 1990), *cert. denied,* —— U.S. ——, 112 S.Ct. 90, 116 L.Ed.2d 62 (1991). We will disturb that ruling only if there is an abuse of discretion resulting in prejudice.

Undoubtedly, the risk of prejudice to a defendant from a joint trial will vary with the facts in each case. In many instances, measures less drastic than severance will suffice to avoid the risk of prejudice. *Id.* 481 U.S. at 211, 107 S.Ct. at 1709; *State v. Sidebottom,* 753 S.W.2d 915, 920 (Mo. banc), *cert. denied,* 488 U.S. 975, 109 S.Ct. 515, 102 L.Ed.2d 550 (1988); *State v. Plaster,* 813 S.W.2d 349, 353 (Mo.App.1991).

■ The record demonstrates that the evidence offered of Zein Isa's conversations neither directly nor inferentially implicates appellant in the murder of their daughter. Zein Isa's conversations focus on his personal distaste for Tina's life-style and his own desire to end Tina's life. This evidence is not so complex that a juror cannot keep separate its admissibility against Zein Isa alone.

Aside from the obvious tendency of this evidence to focus blame away from Isa and solely on Zein Isa, the trial court gave a prophylactic instruction to the jury ordering them to consider these conversations only against Zein. The trial court, prior to the state's offer of evidence regarding Zein Isa's conversations, instructed:

Ladies and gentlemen of the jury, as you know, there are two defendants on trial here, Zein Isa and Maria Isa. Each defendant is entitled to have his or her case decided solely on the evidence which applies to him or her. Some of the evidence in this case is limited under the rules of evidence to one of the defendants and cannot be considered against the other. The tape you are about to

hear may be considered by you only on the case against Zein Isa and not on the case against Maria Isa.

The trial judge may expect that his limiting instructions will be followed. *Francis v. Franklin*, 471 U.S. 307, 325 n. 9, 105 S.Ct. 1965, 1977 n. 9, 85 L.Ed.2d 344 (1985); *State v. Hunter*, 586 S.W.2d 345 (Mo. banc 1979). There is no basis in appellant's argument for us to conclude otherwise.

Appellant has shown no prejudice resulting from the trial court's decision to join the trials. The point is denied.

### 2.

Isa asserts that the trial court erred in overruling her motion for a competency examination and plea of not guilty by reason of mental defect.

■ Section 552.030.2, RSMo 1986, requires a person intending to rely on a defense of mental disease or defect to file notice at the time a plea is entered, within ten (10) days after a plea of not guilty, or at such later date as the court may permit for good cause shown. The purpose of Section 552.030, fixing a time at which notice of intention to rely upon a defense of mental disease or defect must be raised, is to prevent surprise to the State. *State v. Holmes*, 439 S.W.2d 518, 520 (Mo.1969).

Isa entered a plea of not guilty on December 29, 1989. On February 15, 1991, she filed her Motion and Notice for Mental Examination and Plea of Not Guilty by Reason of Mental Disease or Defect. The trial court received evidence and heard argument on the motion on Friday, March 1, 1991, and subsequently overruled her motion.

■ Isa did not file her motion within the time permitted by Section 552.030.2. Her motion succeeds only to the extent she can show "good cause" to permit her new plea. In support of her good cause claim, Isa offered only the testimony of her stepdaughter, Fayrouz Abdeljabber. Ms. Abdeljabber testified that while serving as defense counsel's interpreter she noticed a change in Isa's demeanor and her ability to recall the events leading to Tina's murder.

Defense counsel contended that these variations in Isa's behavior and memory were evidence of a mental disease or defect.

■ The trial court has considerable discretion in ruling upon requests to rely upon mental disease or defect as a defense. *Holmes*, 439 S.W.2d at 520. Ms. Abdeljabber's testimony did not provide competent evidence from which the trial court could have concluded that Isa suffered from a mental disease or defect at the time she participated in the murder of her daughter. Consequently, the trial court did not abuse its discretion in overruling Isa's untimely motion. The point is denied.

### 3.

Isa next urges that the trial court erred in failing to sustain her motion to dismiss the indictment. In support of her claim, Isa argues that the indictment was (a) based upon transcripts of surveillance tapes created without the services of a properly sworn interpreter; and (b) fatally defective in that it failed to allege an essential element of the crime.

### a.

Section 540.150, RSMo 1986, provides for the appointment and swearing of interpreters for use by the grand jury. Section 540.150 allows the grand jury broad discretion to determine whether the presence of an interpreter is necessary. Isa asserts that there is no record showing the presence of an interpreter during the grand jury hearing that resulted in Isa's indictment or whether that interpreter, if present, was properly sworn pursuant to Section 540.150.

■ Isa misunderstands Section 540.-150. That statute requires the swearing of an interpreter who translates "testimony to be given before them [the grand jury] by any witness speaking a foreign language." The oath of the interpreter serves two purposes under the statute. First, the interpreter swears to maintain the secrecy of the grand jury's proceeding. Second, the interpreter swears "to correctly [sic] interpret all questions to the witness into his

language and all the witness' answers into English."

■ Isa's claim here does not focus on live testimony before the grand jury. Rather, it involves the transcripts prepared from audio surveillance tapes taken from her home. The translator's services were performed outside the closed doors of the grand jury hearing. Thus, the secrecy of the grand jury is not subject to compromise. Nor does it appear from the record that there were live witnesses involved for whom the grand jury required an interpreter. Neither purpose of Section 540.150 is served when the grand jury considers no more than a written transcript. Section 540.150 simply does not apply. The point is denied.

b.

■ Isa next alleges that the grand jury's indictment failed to charge an essential element of the crime. The indictment read as follows:

The Grand Jurors of the City of St. Louis, State of Missouri, charge the defendant, MARIA ISA acting with her husband ZEIN HASSAN ISA, in violation of Section 565.020.1, RSMo, committed the class A felony of murder in the first degree, punishable upon conviction under Section 565.020.2, RSMo, in that on or about the 6th day of November, 1989, in the City of St. Louis, State of Missouri, the defendant, MARIA ISA acting with her husband ZEIN HASAN ISA *after deliberation,* knowingly caused the death of PALESTINA ISA by stabbing her.

[Emphasis added.]

Section 565.020.1, RSMo 1986, informs that "[a] person commits the crime of murder in the first degree if he knowingly causes the death of another person after deliberation upon the matter." Isa charges that the grand jury's indictment failed to use the words "after deliberation upon the matter." Isa further maintains that this omission rendered the indictment insufficient and the trial court without jurisdiction to hear the case.

■ We no longer treat indictments and informations as magical incantations that permit defendants to escape if the verbal charms are uttered improperly. The state constitution guarantees a defendant only the right to "demand the nature and cause of the accusation." Mo. Const. art. I, § 18(a). This constitutional guarantee is not to a technically perfect indictment, but to demand notice of the criminal nature and the factual foundation of the crime charged. This guarantee assures that defendants will have notice of the charge, be able to prepare a defense, and avoid double jeopardy. *State v. Borders,* 199 S.W. 180, 182 (Mo.1917).

The indictment in this case states "after deliberation." Isa can prevail only if she can show prejudice. *State v. Parkhurst,* 845 S.W.2d 31 (Mo. banc 1992); *State v. Briscoe,* 847 S.W.2d 792 (Mo. banc 1993). Isa makes no claims of prejudice. The point is denied.

4.

Isa next contends that the trial court erred in failing to sustain her motion to exclude State's Exhibit 1, a taped recording of the sounds of the actual murder, and Exhibit 1–A, the recording's corresponding transcript. Isa advances two arguments in support of her claim of error: (a) Exhibits 1 and 1–A were unlawfully obtained as to Isa since the FBI lacked probable cause to survey her and (b) Exhibits 1 and 1–A constituted inadmissible hearsay.

a.

At trial, the State introduced recordings of the actual murder and of telephone conversations made from the Isa home before and after the murder. The state obtained these recordings from the Federal Bureau of Investigation, which had obtained a court order authorizing electronic surveillance of Zein Isa pursuant to the Foreign Intelligence Surveillance Act. 50 U.S.C. §§ 1801–1811.

■ Evidence obtained from FBI surveillance may be used in a criminal proceeding only in accordance with procedures outlined in 50 U.S.C. § 1806. First, the Attor-

ney General must authorize use of the information in the criminal proceeding. 50 U.S.C. § 1806(b). Notification must then be provided to the court where the criminal proceeding is pending and to the "aggrieved person" against whom the information will be offered. 50 U.S.C. § 1806(c), (d). An aggrieved person is "a person who is the target of an electronic surveillance *or any other person* whose communications or activities were subject to electronic surveillance." 50 U.S.C. § 1801(k). [Emphasis added.]

The federal statute permits the aggrieved person to file a motion to suppress on the ground that the surveillance was illegal. 50 U.S.C. § 1806(e). The government may also seek a determination of legality by filing a petition in the United States District Court where the criminal trial is pending. 50 U.S.C. § 1806(f). The district court's order regarding the legality of surveillance is final and "binding upon all courts of the United States and the several states except a United States court of appeals and the Supreme Court." 50 U.S.C. § 1806(h).

Isa argues to this court that the evidence obtained from the surveillance is inadmissible against her since any probable cause that existed to conduct the surveillance ran only to her codefendant. The State brought an action in the United States District Court for the Eastern District of Missouri seeking a judicial determination of the legality of the surveillance. The district court concluded that probable cause existed to conduct the surveillance and that the FBI conducted its surveillance lawfully. Zein Isa appealed the court's order. Maria Isa did not. The Court of Appeals, Eighth Circuit, affirmed. *United States v. Isa*, 923 F.2d 1300 (8th Cir.1991). Isa's right to challenge the legality of the surveillance, as she now attempts to do in this Court, extinguished when she failed to lodge a timely appeal in the federal courts. The federal district court's order resolves the issue of probable cause. *United States v. Isa*, No. 90–73CR(1) (E.D.Mo. June 18, 1990) (under seal). The point is denied.

**b.**

■ Isa sought to suppress Exhibits 1 and 1–A as inadmissible hearsay. Exhibits 1 and 1–A contained in oral and written form the words and sounds recorded before, during and after Tina's murder.

The rule against the admission of hearsay generally prevents a witness from relating an out-of-court statement of another person for the purpose of proving the truth of that statement. The tape contains Isa's own words. The State did not offer the exhibits to prove the truth of any of the statements Isa made. Instead, her words betrayed both her state of mind during the murder and her participation in it. *See State v. Harris*, 620 S.W.2d 349, 355 (Mo. banc 1981). These exhibits allowed the jury to infer Isa's criminal intent from her own declarations. *State v. Overkamp*, 646 S.W.2d 733, 737 (Mo.1983). The point is denied.

**C. Voir Dire**

Isa raises two points of error relating to the jury selection process.

**1.**

Isa argues that she was deprived of a jury composed of a fair cross-section of the community as required by the Sixth Amendment to the United States Constitution. Specifically, Isa claims that seventeen venirepersons were struck on the ground that they expressed doubt concerning the appropriateness of the death penalty.

■ This is not a novel issue. *Lockhart v. McCree*, 476 U.S. 162, 106 S.Ct. 1758, 90 L.Ed.2d 137 (1986), controls this case. *McCree* holds that the Constitution does not "prohibit the removal for cause, ... of prospective jurors whose opposition to the death penalty is so strong that it would prevent or substantially impair the performance of their duties as jurors at the sentencing phase of the trial." *Id.* at 165, 106 S.Ct. at 1760. *McCree* is founded on the fundamental tenet that both the State and the defendant are entitled to a fair trial. Persons who express general opposition to the death penalty and who express

genuine doubt as to their ability to consider death as a punishment are not prepared to give the State a fair trial.

Isa's real contention is that she is entitled to a petit jury composed of persons who reflect the breadth of the community's ideological positions. First, the fair cross-section requirement does not apply to petit juries. *McCree,* 476 U.S. at 174, 106 S.Ct. at 1765. Second, the fair-cross section requirement, even if made applicable to petit juries, would not extend to ideological positions, which, if followed by a petit juror, would deny the State a fair trial. *Id.* The point is denied.

### 2.

Isa further argues that the trial court erroneously removed venirepersons Walter Warren, Stacey Jones, and Anne Nelson, all of whom expressed opposition to the death penalty.

▆▆▆ We review to determine whether the trial court abused its discretion in sustaining the State's challenges for cause. *State v. Six,* 805 S.W.2d 159, 165 (Mo. banc), *cert. denied,* —— U.S. ——, 112 S.Ct. 206, 116 L.Ed.2d 165 (1991). A trial judge's opportunity to evaluate the totality of a venireperson's verbal and non-verbal responses places that judge in a far superior position to determine the accuracy of a party's challenges for cause than the members of this Court. *State v. Antwine,* 743 S.W.2d 51, 61 (Mo. banc 1987), *cert. denied,* 486 U.S. 1017, 108 S.Ct. 1755, 100 L.Ed.2d 217 (1988). Absent a clear abuse of discretion, the trial court's ruling will not be disturbed on appeal. *Id.*

The relevant portions of voir dire follow:

### WALTER WARREN

Mr. Craddick: What is your opinion on the death penalty?

Venireperson Warren: I think—I could—I don't think it's fair.

Mr. Craddick: Okay. The process that I have outlined for you this morning, did you understand my outline of the process, whether you understand the process or not?

Venireperson Warren: Yes, sir.

Mr. Craddick: Do you believe in your mind that there's a set of circumstances that you can find yourself being involved in such a process and actually, when it comes down to the decision time, voting for the imposition of the death penalty?

Venireperson Warren: No, sir.

Mr. Craddick: Is that under any circumstances?

Venireperson Warren: I just don't think I could not be able to convict somebody of such a charge.

### STACEY JONES

Mr. Craddick: Miss Jones have you formed an opinion on the death penalty?

Venireperson Jones: I think so. It depends on the situation and the crime, and if someone is found guilty or not, but I do believe in an eye for an eye and a tooth for a tooth. But I don't know if—I won't feel comfortable.

\* \* \* \* \* \*

Mr. Craddick: —would you, during that time period, and all the times up until then, keep your mind open to the possibility of voting for either one of the punishments if called upon at that time?

Venireperson Jones: I know I am supposed to. But I can't really fairly say, because I am like an emotional person sometimes. Sometimes my emotions get in the way of what's supposed to be the right thing to do and the wrong thing to do.

Mr. Craddick: You think then because of your personal opinion you might close your mind to the possibility of eventually voting for life imprisonment without the possibility of probation or parole?

Venireperson Jones: I would have to say yes.

### ANNE NELSON

Mr. Craddick: Okay. Do you believe that you could participate in the decision making process that could result in the imposition of the death penalty?

Venireperson Nelson: I'm not sure.

Mr. Craddick: All right. When you say you are not sure, are you not sure that you can give equal consideration to both of the punishments?

Venireperson Nelson: That is correct.

Mr. Craddick: Do you think there's something in your mind that may make you preclude from your consideration one or the other punishments?

Venireperson Nelson: Yes.

Mr. Craddick: And that's clear in your mind; is that?

Venireperson Nelson: Yes.

■■■ After the United States Supreme Court's decisions in *Witherspoon v. Illinois,* 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 *reh'g denied,* 393 U.S. 898, 89 S.Ct. 67, 21 L.Ed.2d 186 (1968), and *Wainwright v. Witt,* 469 U.S. 412, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985), a venireperson can be excused if his or her views on the death penalty "would 'prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.'" *Wainwright,* 469 U.S. at 424, 105 S.Ct. at 852. Even from a reading of the record without the benefit of hearing and seeing the proceedings, this Court is left with the unmistakable impression that venireperson Warren, Jones, and Nelson were prevented or substantially impaired from performing their duties as jurors in accordance with their instructions and oath. We find no abuse of discretion in the trial judge's decision to sustain the State's challenges for cause to Warren, Jones, or Nelson from the jury. The point is denied.

### D. Evidence at Trial

Isa raises numerous points of error relating to evidence adduced at trial. For ease of analysis, we separate the challenged evidence into two categories: demonstrative and testimonial.

### 1. Demonstrative Evidence

■■■ Demonstrative evidence is admissible when it is relevant to a material fact at issue in this case. *State v. Bolder,* 635 S.W.2d 673, 688 (Mo. banc 1982), *cert. denied,* 459 U.S. 1137, 103 S.Ct. 770, 74 L.Ed.2d 983 (1983). Evidence tending to connect a defendant to a crime, prove identity of the deceased, show the nature and character of wounds, or throw light upon a material fact in issue is admissible. *Id.*

a.

■■■ Isa challenges the trial court's admission of photographs depicting the victim and the crime scene. The trial court is vested with broad discretion in determining the admissibility of photographs. *State v. Mease,* 842 S.W.2d 98, 108 (Mo. banc 1992). Photographs that tend to corroborate the testimony of witnesses, assist the jury in understanding the facts and testimony of witnesses, or prove an element in the case are admissible. *State v. Ervin,* 835 S.W.2d 905, 917 (Mo. banc 1992), *cert. denied,* ── U.S. ──, 113 S.Ct. 1368, 122 L.Ed.2d 746 (1993). We reverse only for abuse of discretion. *State v. Cummings,* 607 S.W.2d 685 (Mo. banc 1980).

(i)

■■■ Isa first attacks State's Exhibits 16 and 17. These exhibits depict the victim's naked, traumatized body lying on the autopsy table. Isa contends that the enlarged photographs were unnecessarily gruesome, highly prejudicial, and designed solely to inflame the passions of the jurors. Although gruesome, photographs are generally admissible to assist the jury better to understand the testimony of a witness, to show the nature and location of the wounds, depict the location and condition of the body, or to establish any other element of the State's case. *Mease,* 842 S.W.2d at 108.

■■■ The trial court admitted Exhibits 16 and 17 over defense counsel's objections during the testimony of Dr. Phillip Burch, a medical examiner for the City of St. Louis. With the aid of the exhibits, Dr. Burch showed the jury the precise nature, severity, and location of Tina's wounds. Exhibit 16 was particularly helpful to the jury in that it depicted the unusually close proximity of the wounds; a fact critical to the inference that Tina was being restrained while the fatal blows were struck.

The trial court did not abuse its discretion in admitting Exhibits 16 and 17. The point is denied.

### (ii)

Isa next challenges the admission of State's Exhibits 25, 26, and 27, photographs that depict Tina's body as first discovered by police in the Isa home. The exhibits show generally the location and positioning of Tina's lifeless body, her purse, and two bloodied knives lying near Tina's head. Defense counsel objected, citing the gruesome nature of these photographs.

Murder is usually gruesome. The gruesome nature of a photograph, however, will not limit its admissibility where the photograph serves a legitimate and useful function. *See Ervin,* 835 S.W.2d at 917. Here, the photographs corroborated and explained Officer Ratermann's description of the crime scene. The trial court did not abuse its discretion in admitting these typical crime scene photographs. The point is denied.

### (iii)

Isa's final attack is lodged against State's Exhibit 29, a photograph depicting the living room in which Tina died. Exhibit 29 does not depict the victim's body, murder weapons, or blood stains. It simply gives a panoramic view of the living room from above waist level. Isa contends that Exhibit 29 was cumulative of State's Exhibits 25 through 27.

The record is unclear whether Isa lodged an objection at trial. Assuming she did, however, it was not error to allow Exhibit 29 into evidence. Unlike Exhibits 25 through 27, Exhibit 29 provided a view of the interior of Isa's apartment not provided by the other photographs. This photograph was neither repetitive nor cumulative. It permitted the jury to acquire a spatial orientation not available in the other exhibits. The trial court did not abuse its discretion in admitting Exhibit 29 into evidence. The point is denied.

### b.

Isa claims that the trial court committed prejudicial error in admitting State's Exhibit 15 into evidence, arguing that the State failed to lay a sufficient foundation for its admission. The decision to admit a diagram or drawing into evidence lies within the discretion of the trial court. *State v. Croney,* 425 S.W.2d 65, 68 (Mo.1968). We reverse only for abuse of discretion. *Id.*

State's Exhibit 15 was a floor plan of Isa's apartment. The foundation for the admission of State's Exhibit 15 was laid during the State's direct examination of Officer Billy Qualls. The relevant exchange follows:

Ms. Hayes: What was your—what were your primary responsibilities at the scene?

Mr. Qualls: The evening of early a.m. that I arrived, that particular day I was the scene investigator. The scene investigator basically consists of taking an overview of the scene itself, transposing the measurements, taking particular photographs and seize particular property, particular evidence and conduct any and all measurements at the scene and transpose them to report form.

Ms. Hayes: And did you do that that night?

Mr. Qualls: I did.

Ms. Hayes: All the measurements and everything?

Mr. Qualls: Correct.

Ms. Hayes: Now, have you had an opportunity—I am going to refer you to the exhibit up there right behind you that's already been marked as State's Exhibit 15, Detective Sgt. Qualls. Have you had an opportunity to look at this exhibit?

Mr. Qualls: Prior? I did not.

Ms. Hayes: Would you quickly do so?

Mr. Qualls: Yeah. I believe it to be correct.

Ms. Hayes: What is it a correct rendering of, sir?

Mr. Qualls: It's a rendering or a drawing of the apartment where the body was.

■ Verification of a diagram is similar to the verification of a photograph. The diagram need not be to scale. However, the verifying witness must testify that the diagram is generally a "true," "accurate," or "fair" depiction of the scene or object shown. Officer Qualls verified Exhibit 15 sufficiently to permit the trial court to admit it. Exhibit 15, whether drawn to scale or not, assisted the jury in understanding the testimony of Officer Qualls. There was no error in admitting Exhibit 15 into evidence. The point is denied.

### c.

Isa next claims that the trial court erred in admitting State's Exhibit 2–L into evidence without a prior limiting instruction to the jury.

State's Exhibit 2–L was one in a series of audio tapes played for the jury. Specifically, Exhibit 2–L contained a recorded conversation between Zein Isa and his daughter, Fayrouz Abdeljabbar. The conversation took place immediately following Tina's murder. Prior to presenting Exhibit 2–L to the jury, Isa objected to the following exchange contained on the tape:

Zein Isa: Tina came at 12.

Fayrouz: Yes.

Zein Isa: You understand, five thousand dollars or you die. She grabbed a knife from the kitchen and came straight toward me. By force, me and her mother—unclear—and took the knife from her and stabbed her with it and she died.

Isa contends that the reference to her contained in this exchange was highly prejudicial in that it inferred her involvement in the crime. Failure to give a cautionary instruction as to this conversation, argues Isa, amounted to a clear abuse of discretion.

■ Statements of coconspirators made after the perpetration of a crime for the purposes of concealment are admissible under the coconspirators exception to the hearsay rule. *State v. Pizzella,* 723 S.W.2d 384, 388–89 (Mo. banc 1987). The statements made by Zein Isa to his daughter, Fayrouz, were a part of Zein's and appellant's effort to conceal the actual events surrounding the death of their daughter. The statements fall within the coconspirators exception to the hearsay rule and are admissible against both Zein Isa and appellant without a limiting instruction. The point is denied.

### d.

Isa repackages her earlier unsuccessful argument against joint trials with her objection to the admission of State's Exhibits 3–A, 3–C, 3–D, 3–E, and 3–F, transcripts of taped conversations between Zein and his various daughters and sons-in-law. *See* Section II, Point A. Now, again, in objections to demonstrative evidence, Isa points specifically to the exhibits she contends are inadmissible against her and which contain highly prejudicial evidence from which the jury will infer guilt against her.

The trial court gave a limiting instruction on the admissibility of State's Exhibits 3–A, 3–C, 3–D, 3–E, and 3–F. The evidence over which Isa expresses concern is easily distinguishable as admissible against her codefendant and not her. The conduct of trial depends on the trial court's confidence that limiting instructions will be followed. For the reasons stated in Section II, Point A, and those stated here, we find no abuse of the trial court's discretion in admitting State's Exhibits 3–A, 3–C, 3–D, 3–E, and 3–F. The point is denied.

### e.

Last among Isa's challenges to the State's demonstrative evidence is her claim that State's Exhibit 1,[1] the tape recording of the murder, was highly prejudicial and of little probative value, and should have been excluded from trial.

---

1. Exhibit 1–A, the translated transcript version of Exhibit 1, is equally admissible. The use of such a transcript has been approved by this Court as not violative of the best evidence rule and has been committed to the discretion of the trial court. *State v. Engleman,* 634 S.W.2d 466 (Mo.1982). The trial court did not abuse its discretion in allowing the jury to read the transcript while the tape was played as an aid to understanding.

The trial court has broad discretion in considering the admission of tape recordings; its determinations will not be disturbed on appeal absent a clear abuse of discretion. *See State v. Wahby*, 775 S.W.2d 147, 153 (Mo. banc 1989). The admissibility of a tape recording will, however, depend on the particular circumstances of each case. Despite being aurally startling or disturbing, a taped recording is admissible to assist the jury to understand the facts or testimony of witnesses, the timetable of events, or to establish any element of the State's case.

Isa's real concern is that this tape is too probative. She prefers to sanitize the trial, removing from the jury any evidence that will allow the jury to see her for what she is—a woman who restrained and participated in the torture and murder of her own child.

Exhibit 1 placed the parties at the scene of the crime during the time of its commission. The victim's actual screams and moans, though rarely heard in a murder trial, are part and parcel of this murder. Exhibit 1 aided the jury in understanding the ebb and flow of events on that fateful evening. The probative value of this recording is obvious. Its only potential prejudice to the defendant is that it let the jury hear the truth first hand. The trial court did not err in admitting State's Exhibit 1 into evidence. The point is denied.

## 2. Testimonial Evidence

Isa raises eight points of error focusing on the trial court's rulings concerning testimony at trial. We address each point cognizant of the trial court's broad discretion to consider and admit such evidence and our abuse-of-discretion standard of review. *State v. Newlon*, 627 S.W.2d 606, 620 (Mo. banc), *cert. denied*, 459 U.S. 884, 103 S.Ct. 185, 74 L.Ed.2d 149 (1982); *State v. Miles*, 253 Mo. 427, 161 S.W. 766, 769 (1913).

### a.

Isa again attempts to breathe life into her earlier argument against joint trials with her objection to the admission of Sergeant Qualls' statement as necessitating a prior limiting instruction.

At trial, Sergeant Qualls testified to statements made by Zein Isa immediately following the crime. The critical exchange follows:

Ms. Hayes: All right. And what did he say happened next?

Mr. Qualls: Well he told me that she [Tina] demanded five thousand dollars from he and his wife. And she said— he told me that Mrs. Isa told her [Tina], "what do you need five thousand dollars for? We don't have five thousand dollars. The banks aren't open. What do you need five thousand dollars for?"

Ms. Hayes: And what happened?

Mr. Shaw: Oh, if Your Honor please, I am going to ask that the jury be admonished to disregard that statement as it pertains to Maria. See this is a problem we have. That's hearsay as far as Maria is concerned.

Isa's claim on appeal is that a limiting instruction should have been given *prior* to the testimony given by Sergeant Qualls. The record is devoid of any such request. We review Isa's claim for plain error. Rule 30.20.

In order to justify a limiting instruction, the moving party must demonstrate to the court that the evidence has a prejudicial effect. Statements by a coconspirator in the course of the conspiracy, however, are admissible declarations excepted from the hearsay rule. *Pizzella*, 723 S.W.2d at 388–89. Zein Isa made his statement to Sergeant Qualls in furtherance of a conspiracy to conceal the true events of that evening. Zein Isa's statement is admissible against appellant as that of a coconspirator. There is no plain error. The point is denied.

### b.

Next, Isa charges that the trial court erred in admitting the testimony of Officer Guzy about statements she made immediately following the murder. Isa advances two arguments in support of her position.

### (i)

First, Isa argues that Officer Guzy's testimony about comments she made immediately after the murder are inadmissible hearsay. Officer Guzy interviewed Isa at the crime scene and later at the police station. During this interview, Isa described Tina's threats to her father and how she, Isa, attempted to restrain Tina during the ensuing struggle. Isa argues that the conversation with Officer Guzy does not fall within the admission exception to the hearsay rule.

An admission is the statement or conduct of a party that tends to incriminate or connect her with the crime charged, or which manifests a consciousness of guilt. In determining whether a defendant's statement constitutes an admission, the court must consider the defendant's statement in light of the surrounding circumstances. *State v. Spica*, 389 S.W.2d 35, 53 (Mo.1965), *cert. denied*, 383 U.S. 972, 86 S.Ct. 1277, 16 L.Ed.2d 312 (1966).

Officer Guzy testified that Isa admitted pulling Tina's hair, grabbing Tina from behind, or restraining Tina in the struggle against her father. When considered in the light of the circumstances, these statements tend to incriminate and connect Isa to the crime charged. They state facts that support the State's contention that Isa held Tina while Zein Isa stabbed her to death. Officer Guzy's recounting of Isa's statements was admissible at trial as an admission.

Moreover, a statement need not express an acknowledgment of guilt to qualify as an admission. A false denial can constitute an admission as well as manifest a consciousness of guilt. A permissible inference of guilt may be drawn from the acts or conduct of a defendant, subsequent to an offense, if they tend to show a consciousness of guilt and a desire to conceal the offense or a role therein. *State v. Walker*, 357 Mo. 394, 208 S.W.2d 233, 236 (1948).

Isa contends that her statements to Officer Guzy were of "an exculpatory nature and did not acknowledge guilt in any way."

Evidence in the record unquestionably demonstrates that Isa's statements were, in part, untrue. Isa's recital was simply another stage in the conspiracy she and her husband engineered as they stood over Tina's body and planned to conceal the events of the murder. Insofar as Isa relied on the false story, her statements were admissible to show her desire to conceal her role in the offense. Isa's statements manifested a consciousness of guilt. For this additional reason, her statements are admissions and are admissible. The point is denied.

### (ii)

Second, Isa contends that Officer Guzy based his testimony on an out-of-court statement in violation of Isa's right against self-incrimination.

Isa voluntarily accompanied Officer Guzy to the police station. Once there, she remained free to leave. The St. Louis police did not arrest Isa until several days after she made her statement. Even assuming Isa had become a suspect in the mind of Officer Guzy at the time of her statements, *Miranda* warnings are not required when there is no custodial interrogation. *Oregon v. Mathiason*, 429 U.S. 492, 494–95, 97 S.Ct. 711, 713–14, 50 L.Ed.2d 714 (1977); *State v. Feltrop*, 803 S.W.2d 1, 13 (Mo. banc), *cert. denied*, —— U.S. ——, 111 S.Ct. 2918, 115 L.Ed.2d 1081 (1991). The simple fact that investigative questioning takes place in a potentially coercive environment does not require *Miranda* warnings. *Mathiason*, 429 U.S. at 495, 97 S.Ct. at 714.

Isa did not make her statements during a custodial interrogation. There is no Fifth Amendment violation when voluntary statements are made in a noncustodial setting. The point is denied.

### c.

Isa next maintains the trial court erroneously admitted testimony of Dr. Phillip Burch, the State's medical examiner. Isa sets forth two arguments in support of this position.

(i)

■ First, Isa claims that Dr. Burch did not perform the toxicology report about which he testified. Therefore, her argument continues, his testimony as to the results of the toxicology report are hearsay. We will reverse a conviction for the improper admission of testimony only where the error is prejudicial. *State v. Fulkerson*, 331 S.W.2d 565, 571 (Mo.1960); *State v. Leisure*, 796 S.W.2d 875, 879 (Mo. banc 1990).

■ Dr. Burch testified that the State's toxicology reports showed no trace of drugs or alcohol in her system at the time of her death. This bit of information neither supported nor refuted any facet of Isa's defense. Even if erroneously admitted, Dr. Burch's testimony concerning the report did not prejudice Isa's defense. The point is denied.

(ii)

Isa next asserts that admission of Dr. Burch's testimony improperly injected the victim's character into the case when the defense had not yet raised the issue.

■ Where self-defense is an issue in a criminal case, the trial court may permit a defendant to introduce evidence of the *victim's* prior specific acts of violence of which the defendant had knowledge, provided the prior acts are reasonably related to the crime with which the defendant is charged. *State v. Waller*, 816 S.W.2d 212 (Mo. banc 1991); 1A Wigmore, Evidence § 63 (1983); Mo.Evidence Restated, § 404 (Mo.Bar 1984). In any other form, the character of the victim is not relevant to the guilt of a defendant and may not be raised by any party.

On two occasions, Zein Isa made reference to the possibility of Tina being intoxicated with drugs or alcohol at the time of their final confrontation. In response, the State offered, through Dr. Burch, evidence that Tina's body was free of drugs and alcohol at the time of her death. Such evidence directly contradicted and disputed Zein's assertions. Evidence is relevant if the fact it tends to prove or disprove is a fact in issue, or if it corroborates other relevant evidence that bears on the main issue. *State v. O'Neal*, 718 S.W.2d 498, 503 (Mo. banc 1986), *cert. denied*, 480 U.S. 926, 107 S.Ct. 1388, 94 L.Ed.2d 702 (1987). Evidence that Tina's body was free from drugs or alcohol at the time of the murder, although relevant, infers nothing of her character. Furthermore, Isa made no showing of prejudice resulting from the admission of this evidence. The trial court, therefore, did not abuse its discretion in allowing Dr. Burch's testimony at trial. The point is denied.

d.

Isa raises four points of error concerning the testimony of State's witness, Pamela Fournier, Tina's high school guidance counselor. As grounds for reversal, Isa maintains that the trial court erroneously allowed Ms. Fournier to testify regarding (1) Tina's character (on two separate occasions); (2) her opinion of Isa's beliefs; and (3) previous statements she had made to the principal of Roosevelt High School.

■ It is unnecessary to burden this opinion with the details of each alleged error. Our review will focus on the alleged prejudice, if any, flowing from the admission of such evidence, for we will reverse a conviction for the improper admission of testimony only where there is prejudice to the defendant. *Fulkerson*, 331 S.W.2d at 571. The burden is on Isa to show both the error and the resulting prejudice before reversal is required. *Leisure*, 796 S.W.2d at 879.

Isa makes no showing of prejudice as to any of the points raised in regard to the testimony of Ms. Fournier. Other than the mere allegations of prejudice found in Isa's "questions presented," the record is devoid of evidence describing how the admission of Ms. Fournier's testimony worked an injustice upon Isa's rights or her ability to defend herself. Mere allegations are insufficient to prove or preserve error. *State v. Spraggins*, 368 S.W.2d 407, 413 (Mo.1963). We find no abuse of discretion in the trial court's decision to permit Ms. Fournier's testimony. The point is denied.

#### e.

Next, Isa assigns error to the trial court's refusal to permit cross-examination of Pamela Fournier with regard to her knowledge of Isa's abuse or neglect of her daughter. On direct examination, the State asked Ms. Fournier if she was aware that a call had been made to the Child Abuse Hotline on Tina's behalf. Ms. Fournier responded that she knew of the call but that she was not the person who made the call. On cross-examination, the following exchange occurred:

Mr. Shaw: Now you were asked about something about a hot line. As a matter of fact, didn't you call the State of Missouri's hot line and say that this girl was being abused at home?

Ms. Fournier: I did not.

Mr. Shaw: Well, somebody called you and asked you about it; didn't they?

Ms. Fournier: Yes.

Mr. Shaw: Do you know that the State of Missouri investigated it?

Ms. Fournier: Yes.

Mr. Shaw: And did you learn that they found no abuse and neglect?

Ms. Hayes: Your Honor, I am going to object to that question. If he wants to put that in evidence, it's the appropriate witness to call.

The Court: Sustained.

Great latitude is allowed on cross-examination in criminal cases. The trial court is permitted broad discretion in deciding the permissible scope of cross-examination. *State v. Lue*, 598 S.W.2d 133 (Mo. banc 1980). The standard of review remains abuse of discretion. *State v. Goacher*, 376 S.W.2d 97 (Mo. banc 1964).

The trial court is also permitted broad discretion in limiting the scope of cross-examination, especially as to collateral matters. *State v. Kirk*, 636 S.W.2d 952, 955 (Mo.1982); *State v. Hill*, 371 S.W.2d 278, 281 (Mo.1963). A collateral matter is one that "could not have been shown in evidence for any purpose independently of the contradiction [for which it is offered]." *Black's Law Dictionary* (6th ed. 1990). A defendant, therefore, is entitled to show

material, ultimate facts, but not each and every detail of those facts. *State v. Rose*, 339 Mo. 317, 96 S.W.2d 498, 504 (1936). No right exists for a defendant to show those matters collateral to the main issue or those of "trivial or minor importance." *State v. Burns*, 280 S.W.2d 119, 121 (Mo. 1955).

Defense counsel's question immediately prior to the State's objection called for information outside the scope of direct examination and collateral to the main issue of the case—whether Isa murdered her daughter. Evidence of the alleged child abuse was not relevant to that primary issue. Its usefulness was limited to the impeachment of Ms. Fournier. The trial court was entirely within its discretion when it sustained the objection, choosing to cut short interrogation over this collateral matter.

Isa's suggestion that the limitation infringed her constitutional right of confrontation is also without merit. The Constitution does not require that defense counsel be permitted to ask every possible question on any and all collateral subjects. *Rose*, 96 S.W.2d at 504. On the record before us, we find defense counsel setting out on an excursion into a collateral matter without the prospect of producing any relevant evidence. Indeed, whether a hotline investigation showed or did not show prior child abuse is not relevant to the question whether Isa killed her daughter. We cannot say that the trial judge abused his discretion. The point is denied.

#### f.

Finally, Isa challenges the trial court's denial of her right to rebut and impeach the testimony of the State's witness, Marianna Palladino, on the issue of alleged child abuse.

Marianna Palladino testified on direct examination that she had noticed bruises on Tina's neck and face in October, 1989. She also testified that the bruises appeared around the time that Tina had an altercation with her parents. At no point did Ms. Palladino testify that the bruises were the product of child abuse.

Isa raised and sought to impeach the inference that Tina had been the subject of child abuse. She intended to offer a report of the Missouri Department of Social Services indicating that Tina had, in fact, not been the subject of abuse. Even if allowed, the report would not have contradicted or disproved Ms. Palladino's simple assertion that she saw bruises on Tina's neck and face. The trial court did not abuse its discretion. The point is denied.

### E. Rebuttal Evidence

Isa argues that the trial court improperly denied her the right to call the court appointed translator as a rebuttal witness.

At trial, the State offered, and the court heard, testimony from two interpreters, Peter Heath and Leny Mendible, experts in the translation of the Arabic and Portuguese languages, respectively. The State used Mr. Heath and Ms. Mendible exclusively as translators for the numerous taped conversations offered by the State. On the night of her murder, Tina entered her home only to be greeted by Isa, "[w]here were you, bitch?" Isa's challenge centers on the translation of this statement as found in State's Exhibit 1 and 1–A.

In questioning Ms. Mendible, defense counsel sought to determine whether the Portuguese word for a "female dog" carried with it the same negative connotations as its English equivalent, "bitch." At two separate points in her testimony, Ms. Mendible testified that the Portuguese word ("cadela") did not have a negative or contentious connotation. Soraia Salem, Isa's daughter, made the same point when the State cross-examined her. During this exchange Soraia testified that she was unfamiliar with the term "cadela" but that the Portuguese term for female dog, as she understood it, carried no negative connotations.

Near the close of the defense's case, Isa attempted to call the court-appointed Portuguese interpreter, Ofelia Huelman, to testify as to whether the term "cadela" had a negative connotation similar to its English counterpart. The trial court denied her request.

The scope of rebuttal testimony rests within the broad discretion of the trial court. *State v. Leisure,* 749 S.W.2d 366, 380 (Mo.1988). Ms. Huelman's testimony would say no more than had already been said on three prior occasions by two prior witnesses. The trial court did not abuse it discretion in refusing repetitive and cumulative testimony. The point is denied.

### F. Instructions

Isa next raises five points of instructional error.

#### 1.

First, Isa challenges the trial court's submission of Instruction No. 9, the verdict director for murder in the first degree.

Instruction No. 9 reads:

A person is responsible for her own conduct and she is also responsible for the conduct of another person in committing an offense if she acts with him with the common purpose of committing that offense, or if, for the purpose of committing that offense, she aids or encourages the other person in committing it.

If you find and believe from the evidence beyond a reasonable doubt:

First that on November 6, 1989, in the City of St. Louis, State of Missouri, the defendant or Zein Isa caused the death of Palestina Isa by stabbing her, and

Second, that defendant or Zein Isa knew or was aware that his conduct was causing or was practically certain to cause the death of Palestina Isa, and

Third, that defendant or Zein Isa did so after deliberation, which means cool reflection upon the matter for any length of time no matter how brief, and

Fourth, that defendant Zein Isa did not act in lawful self-defense as submitted in Instruction No. 8, then you are instructed that the offense of murder in the first degree has occurred, and if you further find and believe from the evidence beyond a reasonable doubt:

Fifth, that with the purpose of promoting or furthering the death of Palestina

Isa, the defendant Maria Isa aided or encouraged Zein Isa in causing the death of Palestina Isa and reflected upon this matter coolly and fully, then you will find the defendant Maria Isa guilty of murder in the first degree.

However, unless you find and believe from the evidence beyond a reasonable doubt each and all of these propositions, you must find the defendant Maria Isa, not guilty of murder in the first degree.

If you do find the defendant Maria Isa guilty of murder in the first degree, you will return a verdict finding her guilty of murder in the first degree.

### a.

Isa insists that Instruction No. 9 is not consistent with the indictment charging her. The indictment charged that Maria *and* Zein Isa committed capital murder: "MARIA ISA acting with her husband ZEIN HASAN ISA after deliberation, knowingly caused the death of PALESTINA ISA by stabbing her." Instruction No. 9 submitted the guilt question in terms of the conduct of Maria *or* Zein Isa: "Maria Isa, aided or encouraged Zein Isa." Isa claims that the shift from "and" to "or" renders the instruction invalid and requires reversal.

 Long ago, this Court eliminated the common law distinction between principals and accessories. All persons who act together with a common intent and purpose in the commission of a crime are equally guilty. *State v. Goodman,* 482 S.W.2d 490, 492 (Mo.1972). An indictment or information may charge a defendant either as a principal or as an aider and encourager with the same legal effect. *State v. Lunsford,* 331 S.W.2d 538, 540 (Mo.1960); *State v. Jackson,* 822 S.W.2d 952, 957 (Mo.App. 1992). It is proper to submit to the jury a theory of accomplice liability despite charging the defendant as a principal. *Lunsford,* 331 S.W.2d at 540; *State v. Easton,* 577 S.W.2d 953, 957 (Mo.App.), *cert. denied,* 444 U.S. 863, 100 S.Ct. 131, 62 L.Ed.2d 85 (1979). The point is denied.

### b.

 Isa next submits that Instruction No. 9 lacked the defense of abandonment contrary to MAI–CR3d 304.04. MAI–CR3d 304.04, Notes on Use, Paragraph 10, requires a modification for the defense of abandonment when there is evidence to support the defense. Section 562.041.2(3), RSMo 1986, permits the defense of abandonment when,

> [b]efore the commission of the offense [the defendant] abandons his purpose and gives timely warning to law enforcement authorities or otherwise makes proper effort to prevent the commission of the offense.

This record is barren of any evidence indicating that Isa made any effort to prevent the murder of her daughter. In fact, during the murderous act, Tina's cries for mercy and assistance are met by the cold disinterest of appellant:

> Tina: Mother, please help me!
> Mother: Huh! What do you mean?
> Tina: Help! Help!
> Mother: What help!?
> Tina: (Screams)

After killing their daughter, Isa and her husband engaged in a series of phone calls to police and relatives, in which they spun a tale of deceit to conceal the true events of that evening. This calculated act of concealment and misdirection indicates Isa's continuing cooperation with her husband in the commission of the crime well after abandonment became moot. The point is denied.

### c.

Next, Isa contends that Instruction No. 9 prevented the jury from considering lesser included offenses. Specifically, Isa claims that the language "the murder in the first degree of Palestina Isa," as found in the "Fifth" paragraph of Instruction No. 9, should be replaced with the "death of Palestina Isa." Isa claims proposed modification would have permitted the jury to consider the possibility of lesser offenses by eliminating an automatic finding of culpability on murder in the first degree.

To repeat: If an accomplice has a purpose to promote an offense, she has acquired the requisite culpable state of mind for that offense. *State v. Johns*, 679 S.W.2d 253 (Mo. banc 1984), *cert. denied*, 470 U.S. 1034, 105 S.Ct. 1413, 84 L.Ed.2d 796 (1985). Deliberation is distinctive to murder in the first degree. Accordingly, a verdict director for first degree murder must require a finding of deliberation. By instructing in the alternative in the "Third" paragraph of Instruction No. 9, "defendant or Zein Isa did so after deliberation," the instruction satisfied the requirement of finding that Isa "deliberated."

Paragraph "Fifth" of Instruction No. 9, the section about which Isa complains, tracks the language of MAI–CR3d 304.04, Notes on Use, Paragraph 8(b), and adds the additional assurance that Isa, as an aider and encourager, "reflected upon this matter coolly and fully." This addition makes clear to the jury that it must find Isa, herself, "deliberated" upon the crime charged. By modifying the verdict director to include paragraph "Fifth," the instruction required the jury to ascribe a more specific mental state to Isa, as a first degree murder accomplice. In short, the additional language placed a higher burden on the State than that mandated by Section 562.041.1(2), RSMo 1986. *See State v. Roberts*, 709 S.W.2d 857 (Mo. banc), *cert. denied*, 479 U.S. 946, 107 S.Ct. 427, 93 L.Ed.2d 378 (1986).

If a jury finds that Isa acted with "deliberation" in the murder of her daughter, her culpability can be nothing less than murder in the first degree. Only where the elements of first degree murder are not satisfied should the jury consider the possibility of guilt on a lesser included offense.[2] Therefore, it was not error to instruct the jury to find Isa guilty of murder in the first degree where the elements of Instruction No. 9 were satisfied. We find no error in the trial court's submission of Instruction No. 9 to the jury. The point is denied.

**2.** The jury was subsequently instructed on the crimes of second degree murder and voluntary

#### d.

Isa's final charge of error as to Instruction No. 9 is that it fails to charge the essential element of deliberation. We have already rejected this argument. The point is denied.

#### 2.

Isa believes the trial court committed prejudicial error when it refused her proffered instructions concerning the presumption of coercion between a husband and wife. In support of her instructions, Isa cites *State v. Ready*, 251 S.W.2d 680 (Mo.1952), in which this Court agreed that a presumption exists that a wife, acting in the presence of her husband, is acting under his coercion and thus under duress, and that she is therefore not guilty of a crime committed in his presence. Isa's argument is ill-founded for three reasons.

First, the presumption that a wife, acting in the presence of her husband, acts under his coercion, had its foundation in the notion that marriage "cast upon [a wife] the duty of obedience to and affection for her husband." *State v. Miller*, 162 Mo. 253, 62 S.W. 692, 694 (1901). Our society no longer tolerates the common law fiction that wives are the property of their husbands, unable to think independently, and obedient to the point of criminal acts.

Second, even the common law presumption did not extend to murder.

[I]f a wife commits any felony, *with the exception of murder and treason, and perhaps some other heinous felonies,* in the presence of her husband, it is presumed, in the absence of evidence to the contrary, that she did it under constraint of him, and is therefore excused.

*State v. Baker*, 110 Mo. 7, 19 S.W. 222, 224 (1892). [Emphasis added.]

Third, Missouri's Criminal Code (Chapters 556–600, RSMo 1986) (effective January 1, 1979), codified the common law defense of duress, and, by implication, eliminated the affirmative defense of duress or

manslaughter in Instruction Nos. 10 and 11.

coercion for wives recognized by the common law. Section 562.071, RSMo 1986. In doing so, the statute limited those circumstances under which the defense of duress will be recognized in the State of Missouri.

It is an affirmative defense that the defendant engaged in the conduct charged to constitute an offense because he was coerced to do so, by the use of, or threatened imminent use of, unlawful physical force upon him or a third person of reasonable firmness in his situation would have been unable to resist.

The defense of "duress" as defined in subsection 1 is not available:

(1) As to the crime of murder;

(2) As to any offense when the defendant recklessly places himself in a situation in which it is probable that he will be subjected to the force or threatened force described in subsection 1. Such a presumption takes the marital commitment, "to love and obey" to an unreasonable extreme. More importantly, we note that the presumption did not arise because of any use of or threatened use of unlawful physical force.

Section 562.071 eliminates the affirmative defense of duress when the crime charged is murder.

For the reasons expressed, Isa's proposed instruction misstates the law. The point is denied.

### 3.

Isa also urges that the trial court committed prejudicial error in refusing to accept her proffered Instruction P. Instruction P stated:

The evidence consisting of taped statements of Defendant Zein Isa and persons other than Palestina Isa and Defendant Maria Isa may be considered by you only on the case against Defendant Zein Isa and not on the case against Defendant Maria Isa.

Isa refers this Court to Paragraph 2 of the Notes on Use to MAI–CR3d 310.15, which states in pertinent part: "When an oral instruction limiting the use of evidence was properly given at the time such evidence was received, this instruction may be given on the Court's own motion and must be given at the request of the party in whose favor the limitation applies." In short, Isa maintains that the trial court was bound to accept her proffered instruction since it directly patterned MAI–CR3d 310.15.

The trial court aptly noted that "there are some tapes, in particularly the incident tape, as well as the tapes following the incident ... [that] would apply to both [Zein and appellant]." We agree. Certain tapes contained statements by Zein Isa that were admissible against the appellant as statements of a coconspirator. *See, e.g.,* Section II, Point D, Subsection 1(c). In this regard, Isa's Instruction P misstated the law as to what evidence was admissible against her. The trial court properly refused Isa's Instruction P. The point is denied.

### 4.

Isa challenges the trial court's failure to mark and file her proffered instructions as required by Supreme Court Rule 28.02(e). Specifically, Isa charges that the trial court failed to mark and record three proffered first degree murder verdict directors and that it improperly recorded a fourth. This failure, argues Isa, resulted in an incomplete record that prevented her from effectively challenging the instructions given at trial.

Isa's claim fails on several grounds. First, Isa failed to preserve her point for review by not including in her brief any portion of the refused instructions. Rule 30.06; *State v. Tatum,* 807 S.W.2d 126 (Mo.App.1991). Second, Isa did not support her allegation of error with any citations of authority. Absent a clear and concise explanation as to why authority was unavailable, her point is deemed waived. Rule 30.06; *see State v. King,* 747 S.W.2d 264 (Mo.App.1988). Third, Isa's abstract statement of error preserves nothing for appellate review. Simply to allege a violation of Rule 28.02(e), without setting forth competent facts describing the violation together with a brief and concise state-

ment of the prejudice suffered, is to fail to preserve anything for review. Rule 30.06; *State v. Murphy*, 796 S.W.2d 429 (Mo.App. 1990). The point is denied.

### 5.

Isa submits that the trial court improperly denied her the opportunity to amend her proffered instructions.

During the instruction conference, the State offered a verdict director on murder in the second degree. Recognizing that the verdict director lacked the element of "acting in lawful self-defense," the trial court inquired "[h]ave you included that element lawful—not acting in a lawful self-defense?" The state's prosecutor responded, "[y]es. We realized we had to put that in, and are doing it right now." Defense counsel then offered two verdict directors on second degree murder that included the defenses of abandonment (*see* Section II, Point F, Subsection 1(b)) and husband coercion (*see* Section II, Point F, subsection 2). The trial court refused Isa's instructions. In a creative reading of the record, Isa complains that the trial court's actions denied her the opportunity to amend instructions and showed the trial court's bias against her.

For reasons we have already expressed, Isa's instructions either misstated the law (husband coercion) or were not founded on evidence (abandonment) and amounted to misstatements of the law. The trial court asked defense counsel if he was offering the same, previously refused, instructions on the verdict director of second degree murder. In doing so, the trial court recognized the possibility that defense counsel had the right to proffer something new or different from what had previously been submitted on first degree murder. Defense counsel did not seize the opportunity to offer new legally correct instructions. The trial court properly refused the proposed instructions. Thus, Isa was not deprived of an opportunity to amend her instructions.

▆▆▆ Isa claims that the trial court's actions show its bias against her. The mere fact that the trial court refused erroneous

instructions is not evidence of judicial bias. *State v. DeClue*, 805 S.W.2d 253, 260 (Mo. App.1991). The point is denied.

### III.

Finding no prejudicial error, the judgment of the trial court as to Isa's guilt for first degree murder is affirmed.

### IV.

### Penalty Phase

Isa makes several allegations of error as to events occurring during the penalty phase of her trial. Her allegation of instructional error is dispositive of the issue and requires that we reverse the death sentence and remand for a new penalty phase hearing and resentencing.

In her dispositive point, Isa argues that Instruction No. 8, submitted during the penalty phase, impermissibly ties the conduct of her codefendant to her for the purposes of punishment.

Instruction No. 8 stated:

[A reasonable person is responsible for his own conduct and he is also responsible for the conduct of in [sic] committing an offense if he acts with with [sic] the common purpose of committing that offense, or if, for the purpose of committing that offense, he aids or encourages the other person in committing it.]

In determining the punishment to be assessed against the defendant Maria Isa for the murder of Palestina Isa, you must first unanimously determine whether the following aggravating circumstances exist:

Whether the murder of Palestina Isa involved torture and depravity of mind and whether, as a result thereof, the murder was outrageously and wantonly vile, horrible, and inhuman. You can make a determination of depravity of mind only if you find:

1. That the defendant Maria Isa acting together with Zein Isa inflicted physical pain or emotional suffering on Palestina Isa and that the defendant

Maria Isa did so for the purpose of making her suffer before dying, and

2. That the defendant Maria Isa acting together with Zein Isa committed repeated and excessive acts of physical abuse upon Palestina Isa and the killing·was therefore unreasonably brutal, and

3. That the defendant Maria Isa acting together with Zein Isa killed Palestina Isa after she was bound or otherwise rendered helpless by defendant and that defendant Maria Isa thereby exhibited a callous disregard for sanctity of human life.

You are further instructed that the burden rests upon the state to prove the foregoing circumstances beyond a reasonable doubt.

Therefore, if you do not unanimously find from the evidence beyond a reasonable doubt that the foregoing circumstances exist, you must return a verdict fixing punishment of the defendant Maria Isa at imprisonment for life by the Division of Corrections without eligibility for probation or parole.

[Brackets added to denote language from MAI–CR3d 304.04.]

■■■ The submission or refusal to submit tendered non-mandatory instructions is largely within the broad discretion of the trial court. The trial court must give an applicable MAI–CR instruction where one is available, to the exclusion of any other instruction. Rule 28.02(c) The giving of or failure to give an instruction in violation of Rule 28.02 or any applicable Notes on Use constitutes error, its prejudicial effect to be judicially determined. Rule 28.02(f); *Ervin*, 835 S.W.2d at 923. A defendant is prejudiced by an erroneous instruction when the jury "may have been adversely influenced by [it]." *State v. Lingar*, 726 S.W.2d 728, 738 (Mo. banc 1987), *cert. denied*, 493 U.S. 900, 110 S.Ct. 258, 107 L.Ed.2d 207 (1989), *quoting State v. Rodgers*, 641 S.W.2d 83, 85 (Mo. banc 1982).

■■■ We believe that the submission of Instruction No. 8 during the penalty phase of the proceedings was improper and prejudicial for several reasons. First, paragraph one states: "He is also responsible for the conduct *of in* [sic] committing an offense if he acts *with with* [sic] the common purpose." [Emphasis added.] Instructions are designed to channel the jury's thinking within the narrow confines of the law. An instruction that is confusing, ambiguous or equivocal, even nonsensical, is patently erroneous. Prejudice results because the jury is not given clear guidance. Its deliberations become unchannelled and, therefore, inherently suspect.

Second, Instruction No. 8 fails to follow the language of MAI–CR3d 313.40, which we find applicable to this case. MAI–CR3d 313.40 is the penalty phase instruction submitting statutory aggravating circumstances. The trial court added language from MAI–CR3d 304.04, a guilt phase instruction dealing with a defendant's responsibility for the conduct of another, to MAI–CR3d 313.40 and submitted this hermaphroditic instruction to the jury. This variance constitutes error. Rule 28.02(f). This error is prejudicial because the instruction invites the jury to assess Isa's punishment based on the conduct of her husband.

■■■ To state the obvious, the death penalty differs from all other forms of criminal sanction. The death penalty reflects a societal judgment that a person's acts render them no longer fit to be among us. Such a judgment is of such a magnitude and so final that jury deliberations over the subject must be carefully channelled to consider only the legal justifications for the punishment and not the more broad, often emotional response to the crime in general. Thus, jury instructions setting out statutory aggravating circumstances—those circumstances that, if found, justify the death sentence—must be unquestionably focused on the convicted murderer's own character, record and individual mindset as betrayed by her own conduct. Although it is permissible to find a person guilty of murder for acts done in concert with another, it is never permissible to sentence a person to death for acts

of another. *See Lockett v. Ohio,* 438 U.S. 586, 605, 98 S.Ct. 2954, 2965, 57 L.Ed.2d 973 (1978). ("[A]n individual decision is essential in capital cases.")

As to punishment, Isa must stand alone. The jury must have considered and must have found beyond a reasonable doubt that she intended to make her daughter suffer; that Isa's own acts resulted in an unreasonably brutal murder; or that her own acts showed a callous disregard for the sanctity of human life. While Instruction No. 8 properly included these aggravating circumstances, it also permitted the jury to consider Zein Isa's conduct when assessing Maria Isa's punishment. This is error. The error is prejudicial. It cannot stand.

## V.

The sentence of death is reversed. The case is remanded to the trial court for a new penalty-phase hearing and for resentencing.

All concur.