

# In the
# Missouri Court of Appeals
## Western District

| | | |
|---|---|---|
| STATE OF MISSOURI, | ) | |
| | ) | |
| Respondent, | ) | WD86570 |
| | ) | |
| v. | ) | OPINION FILED: |
| | ) | JULY 29, 2025 |
| MICHAEL HENDRICKS, | ) | |
| | ) | |
| Appellant. | ) | |

**Appeal from the Circuit Court of Jackson County, Missouri**
The Honorable Joel P. Fahnestock, Judge

Before Division Three:  Mark D. Pfeiffer, Presiding Judge, Cynthia L. Martin, Judge and
Janet Sutton, Judge

Michael Hendricks ("Hendricks") appeals his convictions following a jury trial of

first-degree murder, first-degree harassment, attempted enticement of a child, third-

degree child molestation, and first-degree sexual misconduct.[1]  He claims trial court error

in the admission of testimony of M.Y., (a co-defendant),[2] in the admission of a

---

[1]The convictions were pursuant, respectively, to section 565.020, section 565.090, section 566.151, section 566.069, and section 566.093.  All statutory references are to RSMo 2016 as supplemented to the date of Hendricks' offenses unless otherwise indicated.

[2]Pursuant to Missouri Supreme Court Operating Rule 2.02(c)(3), we do not include names of witnesses other than parties.  Though M.Y. is a co-defendant, she is not a party to this appeal, and we therefore refer to her by initials.  M.Y. was also convicted, and has filed her own appeal which is pending in this Court in case number WD86611.

photograph, in failing to sever his trial from M.Y.'s trial, and in failing to *sua sponte* order a mistrial after the admission of inadmissible hearsay and improper propensity evidence. Finding no error, we affirm.

**Factual and Procedural Background**

In the light most favorable to the judgment,[3] the following evidence was adduced at trial:

Hendricks lived in Grain Valley, Missouri with his wife and two children. He began a relationship with M.Y., a woman he met through an escort service. Hendricks gave M.Y. a job with an IT support company that he owned. At the beginning of the relationship, M.Y. lived in an apartment in Claycomo, Missouri. K.A. ("Victim") lived next door to M.Y., and often engaged in three-way sexual activity with Hendricks and M.Y. This sexual activity continued after M.Y. moved from Claycomo to Grandview, Missouri.

M.Y. had a biological daughter, K.M., ("Child") who had been given up for adoption. However, Child reunited with M.Y. in August of 2020 when she was thirteen years old. One night in late November or early December 2020, Hendricks was at M.Y.'s home in Grandview. M.Y. asked Child to put on lingerie, which she did reluctantly. Hendricks told Child she looked beautiful, and then told her to get in bed with him and M.Y. Hendricks was in the middle with M.Y. and Child on either side. The three were watching a scary movie, when Hendricks said that people dying turned him on.

---

[3]When reviewing a jury-tried case, "we view the facts in the light most favorable to the jury's verdict." *State v. Warren*, 702 S.W.3d 48, 50 n.2 (Mo. App. W.D. 2024).

Hendricks began having sex with M.Y., and both Hendricks and M.Y. began touching Child. Hendricks touched Child's vagina over her clothing. The sexual activity stopped when Child was asked to join, and responded that she did not want to.

M.Y. then said that she and Hendricks had something they wanted to tell Child. Hendricks left the room and returned with a camera. M.Y. told Child that she and Hendricks had killed someone. M.Y. took the camera from Hendricks and showed Child pictures of a dead woman. Child's later description of the dead woman in the pictures matched Victim's description. The pictures included one of Victim with a bruised face, naked in a box with her arms tied up to her chest by a rope and her knees up. The pictures also included several of Victim after her body had been dismembered. M.Y. told Child, in Hendricks' presence, that she, Hendricks, and Victim had sex together at M.Y.'s house and that Hendricks choked and killed Victim while they were in bed. Child was told that Victim's body was then taken to Hendricks' house and put in the box, and was later dismembered and put in a freezer. Hendricks' wife (who was his former wife by the time of trial) later testified that a freezer showed up one day in a plane hangar on Hendricks' Grain Valley property, and that Hendricks sold the freezer on Craigslist on or about April 12, 2021.

Hendricks and M.Y. also discussed Victim's murder with M.Y.'s mother ("Mother"). Mother understood that the woman murdered was Victim, who had been reported missing by that time. Mother testified that Hendricks and M.Y. seemed excited to talk about the murder. Hendricks told Mother that what he had done to Victim was something he had always wanted to do, that Victim's life had not been productive, and

3

that he was thankful Victim had given him the gift of experiencing something he had always wanted. Mother was told that it took four minutes to kill Victim. M.Y. showed Mother pictures of Victim taken the night of the murder. One showed Victim alive with a gag ball in her mouth. Other pictures showed Victim's dismembered body in a freezer. Mother was told Victim's body was later buried on Hendricks' property.

On April 13, 2021, Child told her foster care caseworker about the sexual encounter she had with Hendricks and M.Y., and about the pictures she had seen of Victim. The caseworker contacted the Grandview police department. Child was forensically interviewed on April 15, 2021. Child recounted what had happened in a manner that was consistent with her subsequent trial testimony. Child identified Hendricks from a photo lineup, and described a tattoo on his back.

After Child's forensic interview, the authorities canvassed the area around Hendricks' Grain Valley home. Neighbors reported that they had seen a man believed to be Hendricks operating excavating equipment on the property. A warrant was obtained, and Hendricks' property was searched. Victim's remains, which were identified by DNA and fingerprint comparisons, were found buried outside the bedroom window of Hendricks' home. Victim's body was in an advanced state of decomposition, and was found cut into fifteen pieces that had been placed in multiple kitchen trash bags. Similar trash bags were found in the hangar on the property. Zip ties, pieces of wood, and Styrofoam found in the hangar were consistent with items found buried with Victim.

A circular saw was seized from a tool box on Hendricks' property. Blood found on the saw was determined to be three septillion times more likely to be Victim's than

4

that of an unknown person. A manual for a chainsaw was found, but no chainsaw was found. Hendricks' former wife testified that she had seen a box for a chainsaw in a dumpster on their property, but never saw a chainsaw. She testified their property was mostly grass and that they had no need for a chainsaw.

Both M.Y. and Hendricks were arrested, though M.Y. was arrested first. By the time of her arrest, M.Y. had moved from Grandview to a home in Grain Valley. M.Y. called Hendricks from jail, and told him he needed to take out the trash she brought with her from the Grandview home. Based on this call, a warrant was secured to search M.Y.'s Grain Valley home. Police seized lingerie matching Child's description of the lingerie she had been asked to wear. A ball gag was found wrapped in a sheet in the garage. During one of the calls with M.Y., Hendricks said he was expecting to be arrested.

Hendricks' emails revealed that he ordered an Uber in the early evening on October 11, 2020 for a trip that began at an address associated with Victim and that ended across the street from M.Y.'s Grandview address. Victim's phone made outgoing calls from that area at 5:41 and 5:47 p.m. Phone records showed that Hendricks' and M.Y.'s phones were connecting to cell towers in the vicinity of M.Y.'s home on October 12, 2020. Hendricks' phone connected with cell towers located between M.Y.'s Grandview home and Hendricks' Grain Valley home on the afternoon of October 12, 2020; to towers in the vicinity of M.Y.'s Grandview home just after midnight on October 13, 2020; and to towers in the vicinity of Hendricks' home on the night of October 13, 2020. Hendricks rented a U-Haul on October 13, 2020.

5

Hendricks was associated with an iCloud account. The account included an image of something labeled as a "people meat chart." The account also included photos of Hendricks on a backhoe at the entrance to his property, and of a hole being dug by the backhoe. These photos were uploaded to the iCloud account on October 17, 2020. Victim's phone showed activity on October 17, 2020 consistent with it being powered on and then off. Prior to that, the last activity on Victim's phone had been on October 11, 2020.

Hendricks' web browsing activity around the time Victim disappeared was searched. Some searches were conducted on a pornography site, where Hendricks searched for videos using terms that included "behead," "death," "strangle," "murder," "daughter," "snuff," and "necro." Searches on other websites included more than thirty highly incriminating search parameters. There were several searches for missing persons generally, and searches that included Victim's name. A video on Hendricks' phone captured him asking his then wife, "Do you think it's possible to stand over someone as they are dying and yell at them?"

The jury heard evidence about text messages between M.Y. and Mother where M.Y. indicated that she was setting things up so that no one would believe Child's disclosures about M.Y. and Hendricks. M.Y. accused Child of manipulating Mother. Mother chastised M.Y. for attempting to molest Child with Hendricks. M.Y. did not deny the accusation.

Prior to trial, Hendricks filed a motion to sever his trial from M.Y.'s trial. The motion was denied.

6

Hendricks was convicted on all counts with which he was charged, and was sentenced to consecutive sentences of life without parole for first-degree murder, four years for harassment in the first degree, thirty years for attempted enticement of a child, ten years for child molestation in the third degree, and six months in jail for sexual misconduct in the first degree.

Hendricks filed this timely appeal. Other facts will be addressed as pertinent to Hendricks' points on appeal.

**Analysis**

Hendricks raises six points on appeal. In his first and second points, he claims, respectively, that the trial court committed plain error in permitting the admission of certain of M.Y.'s out-of-court statements through Child's testimony because the statements were hearsay, and that the trial court committed error in permitting admission of the same statements over his objection that the statements violated the Confrontation Clause.[4] In his third point, Hendricks claims plain error because the trial court did not *sua sponte* declare a mistrial after a detective read an incriminating text from Mother to M.Y. that was inadmissible hearsay. In his fourth point, Hendricks claims the trial court erred in permitting the admission over his objection of a photograph of Hendricks' child in a pink top because the minimal logical relevance of the photograph was outweighed by its prejudicial effect. In his fifth point, Hendricks claims it was error to deny his motion

---

[4]The Confrontation Clause provides that "[i]n all criminal prosecutions the accused shall enjoy the right . . . to be confronted with witnesses against him." U.S. Const. amend. VI.

7

to sever his trial from M.Y.'s trial because a joint trial subjected Hendricks to incriminating evidence that would not have been admitted had the trials been separate. In his sixth point, Hendricks claims plain error because the trial court did not *sua sponte* declare a mistrial after the State adduced testimony from Mother that Hendricks' type was an eight-year-old, as the evidence was inadmissible propensity evidence.

***The trial court did not error, plainly or otherwise, in admitting Child's testimony that M.Y. told Child, in Hendricks' presence, that Hendricks choked and killed Victim (Points One and Two)***

Hendricks' first and second points on appeal complain about the admission of Child's testimony that M.Y. told her Hendricks choked and killed Victim while M.Y. and Hendricks were showing Child images of Victim on a camera. Hendricks claims it was plain error to admit this testimony because M.Y.'s out-of-court statement was inadmissible hearsay that was outcome determinative. Hendricks also claims that it was error to overrule his objection to admission of M.Y.'s statement on the basis that it violated the Confrontation Clause, as Hendricks was unable to cross-examine M.Y., who did not testify at trial, and the resulting error was not harmless despite other evidence that Hendricks was the person who choked and killed Victim. With respect to both of these points on appeal, Hendricks claims the erroneously admitted evidence carried significant weight in permitting the jury to find the essential element of deliberation required to convict Hendricks of first-degree murder.

Alleged error relating to the admission of evidence is reviewed for an abuse of discretion. *State v. Karim*, 685 S.W.3d 658, 662 (Mo. App. W.D. 2024). "A trial court abuses its discretion when its decision is clearly against the logic of the circumstances

8

and is so unreasonable as to indicate a lack of careful consideration." *State v. Fisher*, 705 S.W.3d 664, 680 (Mo. App. W.D. 2024) (quoting *State v. Denham*, 686 S.W.3d 357, 371 (Mo. App. W.D. 2024)).  However, determining whether a criminal defendant's rights have been "violated under the Confrontation Clause is a question of law that this Court reviews *de novo*." *State v. Roy*, 597 S.W.3d 710, 719 (Mo. App. S.D. 2020) (quotation omitted).  We will only reverse a trial court's erroneous ruling permitting the admission of evidence if the error "was so prejudicial that it deprived the defendant of a fair trial." *Fisher*,705 S.W.3d at 680-81 (quoting *Denham*, 686 S.W.3d at 371).

Where alleged error in the admission of evidence at trial is not preserved by objection at trial or by raising the issue in a motion for new trial, our review is for plain error, at best.  Under Rule 30.20,[5] we have discretion to consider "plain error affecting substantial rights" where manifest injustice or a miscarriage of justice results.  Plain error must be shown to be "evident, obvious, and clear,"  and "outcome determinative." *State v. Wood*, 580 S.W.3d 566, 579 (Mo. banc 2019) (quotations omitted)).

Here, the specific testimony about which Hendricks complains was admitted through Child's live testimony at trial, and through Child's video-taped forensic interview which was played for the jury after foundation was laid by a forensic interviewer who worked with Child Protection Services.  During Child's live testimony, Hendricks raised no objection to Child's reports that M.Y. told her Hendricks choked and killed Victim.[6]

---

[5]All Rule references are to *Missouri Court Rules, Volume I - State, 2025* unless otherwise noted.

[6]In a pretrial *motion in limine*, Hendricks raised a general objection to the admission of any out-of-court statements by M.Y. about Hendricks choking and killing

Just prior to Child's April 15, 2021 forensic interview being played much later in the trial, Hendricks objected on the basis of the Confrontation Clause to statements by Child during her interview that M.Y. told her that Hendricks choked and killed Victim. The trial court overruled the objection, concluding that the statements were not subject to the Confrontation Clause because they were made under circumstances that rendered them to be Hendricks' tacit admissions.

Hendricks' overruled objection preserved his claim of error relating to the Confrontation Clause with respect to admission of Child's forensic interview, but not with respect to Child's live testimony at trial, leaving the latter testimony subject at best to plain error review. Moreover, Hendricks concedes that he never raised a hearsay objection to either Child's live testimony at trial or to her forensic interview statements, leaving that claim of error subject at best to plain error review. *See State v. Minner*, 311 S.W.3d 313, 319 (Mo. App. W.D. 2010) (discussing the difference between a hearsay objection and an objection on the basis of the Confrontation Clause, and explaining that one objection does not preserve the other).

Child testified at trial that M.Y. told Child she and Hendricks had something to show her, and that Hendricks left the room and returned with a camera. M.Y. began telling Child about a couple in the third person, but Child knew M.Y. was referring to she and Hendricks. M.Y. told Child that "they" had killed someone, and that "the man" had

Victim on the basis of the Confrontation Clause. The trial court did not rule the issue, but indicated it would do so prior to opening statements. However, when the issue was again raised with the trial court prior to opening, there is no indication in the record that the trial court ruled the issue.

10

always had the urge to kill someone. M.Y. grabbed the camera and began going through gruesome images of Victim in a box and then dismembered. Child testified that M.Y. said Victim had been invited over for sex, that M.Y., Hendricks, and Victim were all in bed together, and that Hendricks choked and killed Victim. M.Y. told Child the murder occurred around M.Y.'s birthday, which is in early October. Child testified that both M.Y. and Hendricks were showing her the pictures on the camera, that both M.Y. and Hendricks were present when Child was told about Victim's murder, and that Hendricks did not say anything and did not deny what M.Y. said. Child said Hendricks rarely spoke but was present while M.Y. was providing verbal information about what she and Hendricks had done to Victim.

Much later during the trial, the forensic interviewer laid foundation for Child's forensic interview, and the interview was then played for the jury. During the forensic interview, Child consistently stated that in December or January 2020, Hendricks and M.Y. said they had something to tell her, that Hendricks then got out a camera, and that "they" showed her pictures of a girl and "told me they killed her." Child said M.Y. told her that "her boyfriend" killed Victim and they were all sleeping together at the time, and that "her boyfriend choked [Victim] to death and put her body in a freezer." Child identified Hendricks as M.Y.'s boyfriend. During the forensic interview, Child was asked whether M.Y. or Hendricks "ever say where they killed her," to which Child responded "[a]ctually they told me they killed her in their bed when they were having sex, . . . that [Hendricks] killed her and strangled her."

11

With respect to Hendricks' unpreserved claim of error that Child's testimony, both live and through her forensic interview, was inadmissible hearsay, Hendricks has not established evident, obvious, and clear error that was outcome determinative. "A hearsay statement is any out-of-court statement that is used to prove the truth of the matter asserted and that depends on the veracity of the statement for its value." *State v. Kemp*, 212 S.W.3d 135, 146 (Mo. banc 2007) (quotation omitted). However, "[t]he admission of a party opponent is not hearsay." *State v. Case*, 140 S.W.3d 80, 85 (Mo. App. W.D. 2004). "All that is required for the admission of a party opponent to be admitted into evidence is that 'the statements must be material to the issues of the case, must have sufficient probative value to be relevant, and must be offered by the opposing party.'" *State v. Gilmore*, 22 S.W.3d 712, 718 (Mo. App. W.D. 1999) (quoting *State v. Brown*, 833 S.W.2d 436, 439 (Mo. App. W.D. 1992)). Here, M.Y.'s out-of-court statements to Child would not have been hearsay in the case against her as they were her own admissions against interest. The issue, however, is whether M.Y.'s out-of-court statements were admissible for their truth in the case against Hendricks.

"A defendant's failure to deny an incriminating statement made in his presence can constitute a tacit admission." *Id.* (citing *State v. Merrill*, 846 S.W.2d 225, 228 (Mo. App. E.D. 1993)). "A defendant may make a tacit admission by adopting the statement of another 'either by silence or by other conduct significantly acquiescing in the import of the damaging statement.'" *Id.* (quoting *State v. Forest*, 973 S.W.2d 492, 495 (Mo. App. E.D. 1998)). "To qualify as a tacit admission, the following conditions must be met: '(1) the statement must be made in the presence and hearing of the accused; (2) the statement

12

must be sufficiently direct, as naturally would call for a reply; and (3) the statement must not have been made at a judicial proceeding, or while the accused was in custody or under arrest.'" *Id.* (quoting *State v. Samuel*, 521 S.W.2d 374, 375 (Mo. banc 1975)[7] (internal citations omitted)).

All three criteria are plainly established by the record. M.Y.'s statements to Child were made in Hendricks' presence, and were so direct and shocking in their assertion of heinous conduct as would naturally call for a reply by Hendricks if he did not agree with the accusation that he choked and killed Victim. And, M.Y.'s statements were not made in a judicial proceeding or while Hendricks was in custody or under arrest. It was not plain error for the trial court to permit Child to testify about M.Y.'s statements made in Hendricks' presence because the statements were not hearsay as they qualified as Hendricks' tacit admissions.

Moreover, Hendricks acknowledges that "[a]n allegedly wrongful admission of hearsay testimony does not constitute plain error if such testimony is merely cumulative to other evidence properly admitted." *State v. Goodwin*, 43 S.W.3d 805, 818 (Mo. banc 2001). Here, Mother testified about conversations she had with M.Y. and Hendricks about Victim's death where the manner of death was discussed, and where Hendricks expressed his gratitude to Victim for affording him the opportunity to live out his dream

---

[7]In *Samuels*, the Missouri Supreme Court acknowledged United States Supreme Court precedent making it clear that the tacit admission doctrine cannot apply in situations where a defendant's rights against self-incrimination have attached, as in the case where an accused is under some legal compulsion or is in custody. 521 S.W.2d at 375-76. Those circumstances are not relevant here.

13

of killing someone. There is no possibility that Child's testimony about M.Y.'s statements yielded a manifest injustice or a miscarriage of justice when that testimony was cumulative of other evidence as to which no objection was registered at trial, and no claim of error has been raised on appeal.

With respect to Hendricks' objection on the basis of the Confrontation Clause, we have already explained that Hendricks did not preserve this objection with respect to Child's live testimony. But, even crediting Hendricks' objection to Child's identical statements during her forensic interview as sufficient to preserve his claim of error for both Child's live testimony and her forensic interview, Hendricks' claim is without merit.

The Confrontation Clause prohibits "admission of testimonial statements of a witness who did not appear at trial unless [the witness] was unavailable to testify, and the defendant had had a prior opportunity for cross-examination." *Crawford v. Washington*, 541 U.S. 36, 53-54 (2004). Here, although it is Child's trial testimony and forensic interview statements about which Hendricks complains, Hendricks' Confrontation Clause contention does not focus on Child as the "witness." Nor could Hendricks effectively do so. Even assuming Child's trial testimony or forensic interview qualified as "testimonial," (an issue we need not decide), Child testified at trial and was subject to Hendricks' cross-examination. Her statements were not subject to exclusion pursuant to the Confrontation Clause.

Instead, Hendricks focuses on M.Y. as the "witness" whose out-of-court statements to Child were subject to the Confrontation Clause because M.Y. was

14

"unavailable" to testify[8] and thus could not be cross-examined.  However, M.Y.'s

statements to Child would not be subject to exclusion pursuant to the Confrontation

Clause unless they were testimonial in nature.  Though Hendricks makes a bare assertion

that M.Y.'s statements to Child were "testimonial," he presents no authority to support

that proposition.  To the contrary, "recent decisions from the United States Court of

Appeals, Eighth Circuit, indicate that Confrontation Clause protection does not extend to

situations where governmental or law enforcement involvement does not exist."  *Kemp*,

212 S.W.3d at 150 (citing *United States v. Peneaux*, 432 F.3d 882, 895-896 (8th Cir.

2005); *Ferguson v. Roper*, 400 F.3d 635, 638-640 (8th Cir. 2005); *United States v. Lee*,

374 F.3d 637, 643-645 (8th Cir. 2004); *Unites States v. Reyes*, 362 F.3d 536, 540-541

(8th Cir. 2004)).  This is consistent with the fact that "'the principal evil at which the

Confrontation Clause was directed was the civil-law mode of criminal procedure, and

particularly its use of *ex parte* examinations as evidence against the accused. . . . The text

of the Confrontation Clause reflects this focus.'"  *Kemp*, 212 S.W.3d at 149 (quoting

*Crawford*, 541 U.S. at 51, 53-54.  When M.Y. told Child about Victim's murder in

Hendricks' presence, she was not being examined or questioned by anyone, let alone a

---

[8]M.Y. was available in the courtroom during trial as she was a co-defendant. Without developing the contention, or supporting the contention with authority, Hendricks summarily concludes that M.Y. was unavailable because she could not be forced to testify.  We need not further address the merit of this assumption as Hendricks' Confrontation Clause claim is otherwise without merit.

15

representative of the government or law enforcement. Her statements were not testimonial, and thus were not subject to the Confrontation Clause.[9]

Moreover, Hendricks' argument conveniently ignores that M.Y.'s statements to Child in Hendricks' presence were Hendricks' tacit admissions. Hendricks' tacit admissions are not hearsay at all, as "the hearsay rule is designed to protect a party from out-of-court declarations of other persons who cannot be cross-examined . . . ." *Brown*, 833 S.W.2d at 438 (citing IV Wigmore, Evidence sec. 1048 at 4 (1972)). "In the case of an admission of a party opponent, . . . the declarant is the party himself. Because the statement is being offered against him, he is the only one who can object to its admission; and an objection on the basis of hearsay cannot make sense because the party against whom it is offered does not need to cross examine himself." *Id*. (citing IV Wigmore, sec. 1048 at 4). It follows that since testimonial statements subject to the Confrontation Clause are necessarily a limited class of hearsay, the Confrontation Clause does not apply to admissions of a party opponent, including tacit admissions, because admissions of a party opponent are not hearsay. See *Minner*, 311 S.W.3d at 319 (observing that testimonial hearsay subject to the Confrontation Clause is "a subsection of all evidence that is hearsay") (citing *Crawford*, 541 U.S. at 68-69). Stated another way, the

---

[9]At trial, and on appeal, Hendricks relies heavily on *Bruton v. United States*, 301 U.S.123, 126 (1968) for the proposition that the admission of a non-testifying co-defendant's confession violates a defendant's right to cross-examine witnesses under the Confrontation Clause. In stark contrast to Hendricks' case, however, the non-testifying co-defendant's statement in *Bruton* was a testimonial confession made to a postal inspector while the witness was in custody, and while the defendant was not present. *Bruton* is readily distinguishable and is of no assistance to Hendricks.

Confrontation Clause provides that "[i]n all criminal prosecutions the accused shall enjoy the right . . . to be confronted with witnesses against him." U.S. Const. amend. VI. An accused is not being confronted by a witness the accused is entitled to cross-examine when it is the accused's admission that is offered into evidence. *See, e.g., United States v. Crowe*, 563 F.3d 969, 976 n.12 (9th Cir, 2009) (holding that admission of defendant's own statements raised no Confrontation Clause concerns); *Wilson v. United States*, 995 A.2d 174, 185 (D.C. 2010) (holding that admission of defendant's tacit admissions did not violate Confrontation Clause); *People v. Tran*, 460 P.3d 568, 576 (Colo. App. 2020) (holding that "the Confrontation Clause guarantees that a defendant shall have the right to confront the 'witnesses against him,' but it does not guarantee him the right to confront himself").

The trial court did not error, plainly or otherwise, in admitting Child's testimony about M.Y.'s statement to Child in Hendricks' presence that Hendricks choked and killed Victim.

Points One and Two on appeal are denied.

### *The trial court did not error in failing to sua sponte declare a mistrial after a witness read an incriminating text sent by Mother to M.Y., or after Mother testified that Hendricks' type was an eight-year-old child (Points Three and Six)*

In Hendricks' third and sixth points on appeal, he claims error because the trial court did not *sua sponte* declare a mistrial after the admission of inadmissible incriminating evidence. Point three addresses a detective's testimony about a text Mother sent to M.Y., which Hendricks argues was inadmissible hearsay. Point six addresses

17

Mother's testimony about Hendricks' report that his type was an eight-year-old child, which Hendricks argues was inadmissible propensity evidence.

Hendricks acknowledges that he did not object to the testimony at issue, or request a mistrial. He therefore requests plain error review which requires, as we have already explained, evident, obvious, and clear error that results in a manifest injustice or miscarriage of justice because the error is outcome determinative. *Wood*, 580 S.W.3d at 579.

"A mistrial is a drastic remedy to be exercised only in those extraordinary circumstances in which the prejudice to the defendant cannot be otherwise removed." *State v. Ward*, 242 S.W.3d 698, 704 (Mo. banc 2008) (citation omitted). "[A] court should declare a mistrial *sua sponte* 'only in exceptional circumstances.'" *State v. Boyd*, 659 S.W.3d 914, 926 (Mo. banc 2023) (quoting *State v. Clay*, 975 S.W.2d 121, 134 (Mo. banc 1998)). Hendricks has not sustained his burden to demonstrate that prejudice attendant to admitting the evidence about which he complains could only have been remediated by the *sua sponte* declaration of a mistrial.

When a detective prepared to testify at trial, a limiting instruction was given to the jury that exhibits being admitted during the detective's testimony could only be considered in the case against M.Y., and not in the case against Hendricks. This included exhibits showing a text exchange between Mother and M.Y. on April 11, 2021, where Mother said "you tried to molest your daughter with your boyfriend sober so you know you don't have the clarity idiot." The detective testified that M.Y. did not deny Mother's allegation. M.Y. later objected to the detective's testimony on the basis of hearsay and

18

requested a mistrial. M.Y.'s objection was overruled. The propriety of that ruling, which addressed evidence admitted solely for consideration in determining M.Y.'s guilt, is not before us. However, because the jury had been instructed that this evidence could not be considered in determining Hendrick's guilt, it is absurd to suggest that the trial court should have *sua sponte* declared a mistrial in Hendricks' case. We assume the jury followed the limiting instructions given by the trial court. *State v. McFadden,* 369 S.W.3d 727, 752 (Mo. banc 2012).

Hendricks once again relies heavily on *Bruton v. United States*, 391 U.S. 123 (1968) to argue that a co-defendant's incriminating admissions violate a defendant's rights under the Confrontation Clause, and that the violation cannot be overcome by a limiting instruction. But, we have already explained that the Confrontation Clause is inapplicable to M.Y.'s out-of-court statements, whether made to Mother or to Child, as they were not testimonial in nature. Moreover, Mother, (who was the source of the text to M.Y.), did testify and was available for cross-examination. Hendricks has thus failed to "overcome the presumption that the jury followed the trial court's [limiting] instruction." *McFadden,* 369 S.W.3d at 752. Moreover, Hendricks' argument flatly ignores the cumulative evidence that was admitted without objection through Child's live testimony and forensic interview about Hendricks' acts of sexual misconduct. Any arguable "prejudice" associated with the limited admission of Mother's text to M.Y. was diluted, if not completely erased, by Child's far more compelling direct account of Hendricks' acts.

19

The trial court did not plainly error in failing to *sua sponte* declare a mistrial after a detective testified about a text message Mother sent to M.Y. about M.Y.'s attempt to molest Child with her boyfriend. Point Three on appeal is denied.

We reach the same conclusion with respect to point six on appeal, where Hendricks complains that the trial court should have *sua sponte* declared a mistrial after Mother testified that his type was eight-year-old children, evidence he now claims was inadmissible propensity evidence. Mother testified at trial that the first time she met Hendricks was when he and M.Y. told her about murdering Victim. During this conversation, Mother testified that Hendricks asked to see Mother's breasts. Mother later testified as follows:

> Q: Now, other than [Hendricks] talking to you about -- well, [M.Y.] saying you're just [Hendricks'] type, did [Hendricks] ever tell you about the type of woman he liked?
>
> A: Just, like, an eight-year-old girl.
>
> Q: When did he tell you that?
>
> A: Or boy, I can't remember if he said boy or girl, but I think he said boy. An eight-year old boy.
>
> Q: And if you told the detective in your statement that it was an eight-year-old girl, would that -- would you believe your statement at that time would be more accurate?
>
> A: If that's what it says. I -- the -- the impression I get -- I say "boy," because the [Victim's] look -- the looks that she had at that time was similar to that of a young boy. And then there were pictures on his phone -- because he did release his hand from the phone -- and, you know, I had scrolled past the pictures of [Victim] and to family photos and to a picture of his daughter taking a shower.
>
> Q: Okay.

20

A: At around eight years old and she was that old or a little more.

Hendricks summarily argues in his brief that the aforesaid testimony was improper propensity evidence, and then summarily argues that the only remedy to cure the "substantial prejudice" from admission of the evidence was a mistrial because the evidence portrayed him as a pedophile, and was outcome determinative. We disagree. As the State points out, Mother's vague references to Hendricks' self-reported "type" are not clear evidence associating Hendricks with some other crime. *See State v. Marley*, 598 S.W.3d 204, 215 (Mo. App. W.D. 2020) (holding that "[v]ague references are not clear evidence associating a defendant with other crimes") (quotation omitted). Moreover, Hendricks' admitted proclivity was relevant to show his motive and intent to engage in sexual misconduct with Child, and was thus logically relevant to establish his guilt of the crimes for which he was being tried. *See State v. Miller*, 372 S.W.3d 455, 473 (Mo. banc 2012) (recognizing that evidence of other crimes may be admitted to show, among other things, motive, and intent to commit a charged offense). Finally, even assuming that Hendricks could overcome the hurdle of demonstrating that Mother's testimony was inadmissible propensity evidence, (which he has not), Hendricks has not explained how alleged prejudice associated with the evidence could only have been remedied by the *sua sponte* declaration of a mistrial. *Boyd*, 659 S.W.3d at 926.

The trial court did not plainly error in failing to *sua sponte* declare a mistrial after Mother testified about Hendricks' statement about his "type." Point Three on appeal is denied.

21

*Hendricks cannot establish that he was prejudiced by the admission of a photograph of Hendricks' child in a pink shirt (Point Four)*

Hendricks complains in his fourth point on appeal that the trial court abused its discretion when it admitted exhibit 312, a photograph of Hendricks' daughter in a pink shirt, over Hendricks' objection that the photograph, though of limited logical relevance, was not legally relevant because it was highly inflammatory.

We have already explained that a trial court's alleged error in the admission of evidence is reviewed for an abuse of discretion, and that even if error is found, it will not result in reversal unless there is a reasonable probability that the error affected the outcome of the trial or deprived the defendant of a fair trial. *Wood*, 580 S.W.3d at 574. We need not address whether the trial court abused its discretion in admitting exhibit 312 because Hendricks has not established prejudice in the admission of the exhibit at all, let alone outcome determinative prejudice.

M.Y. was charged with possession of child pornography based on a picture found on her phone of a young girl's genitals with the bottom of a pink shirt visible (State's exhibit 314). State's exhibit 312 was a picture of Hendricks' daughter wearing a pink shirt. Hendricks objected to the admission of both pictures on the grounds that the prejudicial effect of the pictures outweighed any probative value they might have. The trial court overruled Hendricks' objection to admission of exhibit 312, but reserved a ruling on the admission of exhibit 314, which had not yet been offered into evidence.

Later, when exhibits 312 and 314 were shown to the jury as part of a power point of images from M.Y.'s phone, Hendricks did not repeat his objection to the admission of

22

exhibit 314 based on his understanding that the trial court would be giving a limiting instruction. In fact, the trial court did instruct the jury before the power point was published that exhibit 314 could only be considered in the case against M.Y., and could not be considered in the case against Hendricks. Though exhibit 314 formed the basis of the charge against M.Y. for possession of child pornography, the jury acquitted M.Y. of that charge.

Hendricks argued in his motion for new trial, and now argues on appeal, that the admission of exhibit 312 over his objection inflamed the jury by suggesting that the genitals depicted in exhibit 314 belonged to Hendricks' daughter. We are not persuaded that the attenuated connection between exhibit 312 and exhibit 314 was prejudicial to Hendricks at all, let alone so much so that without the admission of exhibit 312 into evidence, Hendricks would not have been convicted. The combined exhibits were insufficient to persuade the jury to convict M.Y. of possession of child pornography. And the other evidence of Hendricks' guilt recounted in this opinion is overwhelming.

Because Hendricks has not established outcome determinative prejudice relating to the admission of exhibit 312 into evidence, Point Four on appeal is denied.

### The trial court did not error in denying Hendricks' motion to sever his trial from M.Y.'s trial (Point Five)

Hendricks argues in his fifth point on appeal that the trial court abused its discretion in denying his motion to sever his trial from M.Y's trial because M.Y.'s out-of-court admissions implicating Hendricks in choking and killing Victim, and in molesting

23

Child, were admissible against M.Y. but not Hendricks, and were either not subject to a limiting instruction, or were subject to a limiting instruction that was not effective.

"Courts traditionally favor joint trials." *State v. Isa*, 850 S.W.2d 876, 885 (Mo. banc 1993). "Joint trials 'play a vital role in the criminal justice system,' *Richardson v. Marsh*, 481 U.S. 200, 209 (1987), and 'serve the interests of justice by avoiding inconsistent verdicts and enabling more accurate assessment of relative culpability -- advantages which sometimes operate to the defendant's benefit.'" *Id*. (quoting *Richardson*, 481 U.S. at 210). "A motion to sever is appropriate only where there exists a serious risk of compromise of the defendant's rights or the jury's ability to make a reliable judgment about guilt or innocence." *Id*. Thus, pursuant to Rule 24.06 and section 545.880, "which govern the propriety and procedure of severing joint trials, severance is required, upon the defendant's written motion, [only] if the trial court finds the probability for prejudice exists or a separate trial is necessary to achieve a fair determination of defendant's guilt or innocence." *State v. Denzmore*, 436 S.W.3d 635, 640 (Mo. App. E.D. 2014).

Here, Hendricks' motion to sever his trial from M.Y.'s trial was denied. "The decision to sever a joint trial lies within the sound discretion of the trial court." *Isa*, 850 S.W.2d at 885. On review, we will not disturb a trial court's ruling on a motion to sever a joint trial unless there is an abuse of discretion resulting in prejudice. *Id*. "In many instances, measures less drastic than severance will suffice to avoid the risk of prejudice." *Id*. (citations omitted). Hendricks bears the burden on appeal to affirmatively establish

24

that his joint trial with M.Y. prejudiced his right to a fair trial. *Denzmore*, 436 S.W.3d at 640.

Hendricks bases his claim of trial court error on the alleged prejudicial effect of two categories of evidence: (i) Child's testimony about M.Y.'s statements that Hendricks choked and killed Victim, and (ii) a detective's testimony about Mother's text to M.Y. accusing her of trying to molest Child with Hendricks. Hendricks claims that this evidence is highly incriminating and prejudicial, violates the Confrontation Clause, and would not have been admissible in his separate trial. Hendricks also claims that either no limiting instruction was given to address the prejudicial impact of this evidence, or that the limiting instruction given was not effective.

Hendricks' contentions are plainly without merit with respect to Childs' testimony about M.Y.'s statements in Hendricks' presence that Hendricks choked and killed Victim. We have already explained that whether Child or M.Y. is viewed as the "witness," the Confrontation Clause is not implicated, as Child testified at trial and was subject to cross-examination, and as M.Y.'s statements to Child were not testimonial. Even more basic than that, however, is that M.Y.'s statements to Child in Hendricks' presence were Hendricks' own admissions under the tacit admission doctrine. Plainly, Hendricks's admissions against his own interest would have been admissible in a separate trial, had one been conducted.

Hendricks' contentions with respect to detective's testimony about the text from Mother to M.Y. about attempting to molest Child are also without merit. As we have explained, the trial court instructed the jury that evidence expected to be admitted during

25

detective's testimony, including the aforesaid text exchange, could only be considered in the case against M.Y., and could not be considered in the case against Hendricks. "The trial judge may expect that his limiting instructions will be followed." *Isa*, 850 S.W.2d at 886 (citing *Francis v. Franklin*, 471 U.S. 307, 325 n.9 (1985)). "There is no basis in [Hendricks'] argument for us to conclude otherwise." *Id.* Though Hendricks contends that the detective's testimony about Mother's text violated the Confrontation Clause, his argument ignores that Mother testified and was available for cross-examination. And Hendricks' argument ignores that nothing about the context of Mother's text exchange with M.Y. would permit us to conclude that Mother's text statement, or M.Y.'s tacit admission by virtue of not denying the statement, were testimonial in nature as to subject the text exchange to the Confrontation Clause.

Hendricks has not sustained his burden to show that the trial court abused its discretion in denying his motion to sever, or to show prejudice in the form of a serious risk of compromise of his rights or of the jury's ability to make a reliable judgment about his guilt or innocence. Moreover, Hendricks has not shown that the less drastic measure of a limiting instruction given in the case of testimony about Mother's text to M.Y. was insufficient to avoid the risk of prejudice.

Point Five on appeal is denied.

**Conclusion**

The trial court's Judgment is affirmed.

_____
Cynthia L. Martin, Judge

All concur